UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

REBEKAH JOY BREYER, an individual,

                   Plaintiff,

    v.

PACIFIC UNIVERSITY, a domestic
nonprofit corporation,

                   Defendant.

Case No. 3:17-cv-00036-AC

OPINION AND
ORDER

ACOSTA, Magistrate Judge:

*Introduction*

    Rebekah Joy Breyer ("Breyer") filed this lawsuit against Pacific University ("Pacific") alleging Pacific discriminated against her in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). Breyer also brings claims for breach of contract and estoppel under state law. Currently before the court is Pacific's Motion for Summary Judgment ("Motion"). (Def. Pacific

University's Mot. For Summ. J., ECF No. 63 ("Mot.").) For the following reasons, Pacific's Motion is GRANTED in its entirety.

*Preliminary Procedural Matter*

Pacific challenges a portion of the Declaration of Rebekah Breyer ("Breyer Declaration"), which was submitted in opposition to Pacific's Motion. (Decl. of Rebekah Breyer in Opp'n to Pacific University's Mot. for Summ. J., ECF No. 81 ("Breyer Decl.").) Specifically, Pacific alleges certain assertions made in Paragraph 3 of the Breyer Declaration explicitly contradict Breyer's previous deposition testimony, and that she has failed to explain or otherwise reconcile such contradictions. (Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 92 ("Def.'s Reply"), at 34.) Consequently, Pacific argues this court should disregard the offending statements included in Paragraph 3 in considering this Motion. (*Id.* at 35.)

The Supreme Court has recognized the "virtual unanimity" of circuit courts that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). The Ninth Circuit follows this rule, reasoning that: "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted) (quoting *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)). However, the "rule is in tension with the principle that a court's role in deciding

a summary judgment motion is not to make credibility determinations or weigh conflicting evidence" and "'should be applied with caution.'" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)).

This rule does not extend to cases "in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Id.* at 267. "The non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995). Therefore, the district court must determine whether the contradictory testimony was given in an honest effort to clarify, or was an intentional alteration, designed to create a genuine issue of material fact. *Melendez v. Morrow Cty. Sch. Dist.*, No. 07-785-AC, 2009 WL 4015426, at *14–15 (D. Or. Nov. 19, 2009) (declaration statements did not directly contradict prior testimony and, therefore, were admissible to create a genuine issue of material fact).

Paragraph 3 of the Breyer declaration states, in relevant part:

> I reviewed <u>Exhibit 11</u> (Pacific's Non-Discrimination Policy); <u>Exhibit 77</u> (Preparing for Postsecondary Education page from Pacific's website); <u>Exhibit 78</u> (Educational Access for Students with Disabilities: Rights and Responsibilities to Assure Educational Access for Students with Disabilities page from Pacific's website); and <u>Exhibit 85</u> (Pacific University Diversity page from Pacific's website). I reviewed all of these exhibits prior to applying to Pacific.

(Breyer Decl. ¶ 3.) Pacific asserts this portion of Paragraph 3 contradicts Breyer's deposition testimony regarding the information she reviewed before she decided to apply to Pacific. (Def.'s

Reply, at 34.)

With regard to Breyer's application decisions, the deposition testimony referenced by Pacific provides:

Q.    What information did you rely on in making your decision about where to apply? What kinds of documents did you review?

A.    Documents?

Q.    How did you get information about [Pacific] and [University of Denver]?

A.    DU, because it's in Colorado, I was able to meet with the director personally, and then I looked at their website. And then Pacific, I looked at just their website.

Q.    What parts of the website did you look at?

A.    As I recall, everything that had to -- to do with the actual PsyD program.

Q.    Okay. So can you list what those things were? What information were you looking for about the PsyD program?

A.    I can recall course work, there was a diversity iss [sic] -- inclusion, faculty of course.

*  *  *  *

A.    And with each university I looked at both the -- each faculty's specialty.

Q.    Anything else?

A.    I -- I think that each -- each website I tried to get a -- get a feel for the overall feeling of the program, as much as you can on a website.

Q.    Anything else that comes to mind?

A.    I did look at that -- what is it called? -- the EPPP test, performance -- it's the test that you had to take a day in PsyD to get licensed.

Q.    So is that a test that's administered by the State?

A.    Honestly, I don't know the details. Like I know it is the State -- like State regulated, but I'm not sure, yeah.

Q. So it's called the EPPP test?

A. Yeah.

Q. Okay.

A. I believe so, something --

Q. But that's a test that is relevant to licensure, not getting your PsyD, right?

A. Correct.

Q. Okay.

A. But I wanted to look at --

Q. That's reasonable.

A. -- if -- if the school prepared you enough.

Q. Right. What specifically did you review on Pacific's website about diversity and inclusion?

A. I think -- hm. Let me think about it, because I did look at a lot of websites. As I recall, they specifically had a diversity video, I think, or an actual section that -- that talked about diversity. Yeah, that's all I can really recall at this point.

(Dep. Of Rebekah Joy Breyer dated October 26, 2017 ("2017 Breyer Dep."),[1] 78:9–80:11.)

Paragraph 3 does not directly contradict this testimony with regard to Breyer's assertion that she reviewed materials concerning diversity prior to applying to Pacific. Rather, Paragraph 3 clarifies or supplements such testimony because it provides the specific page on Pacific's website that Breyer reviewed with respect to the topic of diversity. The court therefore will consider

---

[1] The "Oct. Breyer Dep." is filed as part of Exhibit 1 of the Declaration of Taylor D. Richman dated July 20, 2018 ("July Richman Declaration") (ECF No. 64-1, at 1–44), Exhibit C of the Declaration of Christina Stephenson ("Stephenson Declaration") (ECF No. 85-3), and Exhibit 10 of the Declaration of Taylor D. Richman dated October 10, 2018 ("Oct. Richman Declaration") (ECF No. 93-5).

Paragraph 3 insofar as it alleges Breyer reviewed the Diversity page on Pacific's website prior to applying to Pacific.

However, Paragraph 3 contradicts Breyer's testimony concerning the other materials she claims to have reviewed before applying to Pacific. Specifically, Breyer testified that as far as she could recall, her review of Pacific's website was limited to "everything that had . . . to do with the PsyD program." When asked for clarification, Breyer testified that other than the specific "section that . . . talked about the diversity," she reviewed information on Pacific's website regarding the course work, faculty, and licensing requirements associated with the PsyD program. Nothing in Breyer's testimony suggests she reviewed any information outlining the legal rights of disabled students or Pacific's legal obligations with regard to disabled students and its commitment to fulfilling those obligations. In fact, there is no indication her pre-application research strayed beyond those portions of the Pacific website explicitly dedicated to communicating the substance of the PsyD program and the qualifications of its faculty, much less that she found and reviewed Pacific's nondiscrimination policy and various pages of disability-specific legal information available on an entirely separate area of the website.

With respect to the materials Breyer reviewed prior to applying to Pacific, Paragraph 3, when fairly viewed, does not provide clarification of her previous testimony nor does it offer any explanation for the inconsistencies between her deposition testimony and her declaration. Rather, Paragraph 3, to the extent that it pertains to Breyer's alleged review of Exhibits 77, 78, and 85, alls within the category of contradictory affidavit testimony inappropriate on summary judgment regarding her promissory estoppel claim. Therefore, the court declines to accept, for the purposes of this Motion, that Breyer reviewed Pacific's nondiscrimination policy, the "Preparing for

Postsecondary Education" page on Pacific's Website, and the "Educational Access for Students with Disabilities: Rights and Responsibilities to Assure Educational Access for Students with Disabilities" page on Pacific's website before deciding to apply to Pacific.

*Background*

I.      Pacific, the SPP, and the PsyD Program

    *A.    Pacific and the Role of Diversity in the SPP*

Pacific is a private, postsecondary educational institution in the State of Oregon. (Corrected Second Am. Compl., ECF No. 62 ("SAC"), ¶ 8.) The School of Professional Psychology (the "SPP"), which is housed within Pacific, offers several doctoral tracks for students seeking to become psychological professionals. (Decl. of Christina Stephenson in Opp'n to Def. Pacific University's Mot. for Summ. J., ECF No. 85 ("Stephenson Decl."), Ex. K, at 13.) Because psychologists treat all manner of persons, "diverse representation among providers, academics, [and] researchers is essential" to the profession. (Dep. of Christiane Brems, PhD ("Brems Dep.")[2] 19:25–20:2.) To that end, the SPP has a "profound commitment to fostering diversity" in its programs. (*Id.*) The SPP contemplates diversity to include "a very, very broad spectrum of human characteristics, everything from religion to gender, to sexual orientation, to ethnicity to culture, to subcultures, age . . . [or] anything that makes . . . human beings [unique] on an individual level." (*Id.* 20:11–18.) "Disability" thus is one of several characteristics incorporated into the SPP's conception of diversity, and the SPP considers diversity as one of its core values. (*Id.* 19:25–20:2, 19–21.)

Pacific's commitment to diversity and inclusion is memorialized in its Non-Discrimination

---

    [2] The "Brems Dep." is attached as Exhibit B to the Stephenson Declaration (ECF No. 85-2) and Exhibit 12 of the Declaration of Taylor D. Richman ("Richman Declaration") dated October 10, 2018 (ECF No. 93-7).

Statement, which provides, in relevant part:

> Pacific University does not discriminate on the basis of sex, physical or mental disability, race, color, national origin, sexual orientation, age, religious preference, or disabled or Vietnam Era status in admission and access to, or treatment in, employment, educational programs, or activities, as required by . . . section 504 of the Rehabilitation Act of 1973 . . . [and] the Americans with Disabilities Act of 1990[.]"

(Stephenson Decl., Ex. K, at 12.)  In other words, the Non-Discrimination Statement conveys Pacific's intention not to discriminate on a variety of bases in compliance with Section 504 and Title III of the ADA.  (Dep. of Jennifer Clark, Ph.D. dated March 23, 2018 ("2018 Clark Dep.")[3] 100:19–101:21.)  The Non-Discrimination Statement is published on Pacific's website for review by "potential applicants, students, employees, [and] faculty [who] can read it, see it, [and be] aware of it."  (*Id.* 100:19–23.)  The Non-Discrimination Statement is also included in various written publications that are provided to students, such as the Academic Catalog, the SPP Student Handbook, the Business Office Student Contract, and class syllabi.  (Stephenson Decl., Ex. K, at 172; Clark Dep. 128:21–129:3.)

   *B.*    *The PsyD Program*

   The SPP offers a Doctor of Psychology ("PsyD") degree.  (SAC ¶ 8.)  Students seeking to earn a PsyD degree must complete a five-to-aeight year program, which consists of "a core academic curriculum, two year-long practicum experiences (including one year at a[n SPP] run clinic and one year at a community site), a doctoral dissertation, and a one-year internship that is accredited by the American Psychological Association and overseen by the Association of Psychology Postdoctoral and Internship Centers."  (Decl. of Dr. Jennifer Clark, in Supp. of Def.'s Mot. for Summ. J., ECF

---

[3] The "2018 Clark Dep." is attached as part of Exhibit D to the Stephenson Declaration (ECF No. 85-4, at 5–25).

No. 65 ("Clark Decl."), ¶ 3.) After completing the PsyD program, students also must pass a national licensing exam and fulfill any licensing requirements specific to the state in which he or she intends to practice. (*Id.* ¶ 5.)

### 1. The Essential Functions

Prior to beginning the PsyD program, admittees are provided with a copy the "Essential Job Functions" document ("essential functions document"), which outlines the fundamental skills required of students enrolled in the SPP (the "essential functions"). (Stephenson Decl., Ex. K, at 7.) The essential functions document conveys Pacific's expectation that all students entering the SPP are able to "complete all [listed requirements] with or without reasonable accommodation to complete the [PsyD] program." (2018 Clark Dep. 48:6–14.) The essential functions document is not a formal element of the admissions process, but serves as an informal framework by which Pacific gauges and assesses the skills and qualifications of applicants. (*Id.* 49:13–20.)

Historically, Pacific has provided the essential functions document to newly admitted students as a component of the admissions packet. (*Id.* 51:17–23.) Occasionally, however, if an applicant references "some need for [accommodation] or [a] concern about [his or her] ability to perform something, [Pacific will] talk with [that applicant] about the essential functions[.]" (*Id.* 49:21–50:1.) The essential functions document is also consulted if "issues [are] raised during the course of interviews that suggest[] [Pacific] need[s] to think about [an applicant's] ability to perform essential functions." (*Id.* 51:8–16.) Under such circumstances, Pacific provides the applicant in question "with information about [its] processes and accommodations." (*Id.*)

As relevant here, the essential functions of the PsyD program include, but are not limited to, a variety of physical requirements:

> [s]tand, sit, bend and reach *while performing clinical assessments*, therapy, and daily coursework/paperwork. Ability to function in a structured environment for several hours. Attend up to 9 hours of class per day. Participate in courses and clinical work for several hours at a time up to 6 days per week (clinical work may occur on Saturdays). Participate in clinical work 12 months out of the year. Effectively manage physical conditions in order to prevent impediments to appropriate services.

(Stephenson Decl., Ex. K, at 7 (emphasis added).) As well as various communication requirements:

> Speak, read, and write English clearly. Document clear and legible handwritten notes. Organize thoughts and ideas into appropriate written referenced essays, research papers, and clinical notes, when appropriate. Enhance the dignity and image of the psychology profession through positive public information dissemination.

(*Id.*) All students must sign the essential functions document to acknowledge receipt, review of its contents, and understanding of the skills required. Each student's signature also serves to affirm that he or she is capable of performing the essential functions necessary to succeed in the PsyD program. (*Id.*)

### 2. Clinical Assessment Testing

A core component of the PsyD program is the development of practical skills, including how to properly administer clinical assessment tests. (*Id.*) PsyD students must learn to correctly administer clinical assessment tests because the administration of each test battery must be standardized — that is, every test must be "performed the same way by every psychologist who administers them, every time." (*Id.* ¶¶ 11, 12.) Standardization is crucial because the results of non-standard test administrations are invalid, and in some cases, concerns about test validity may preclude the retesting of a patient for several months. (*Id.* ¶ 13.) Accordingly, the precise administration of clinical assessment tests is an important skill students must learn in the PsyD program. (*Id.* ¶ 10.)

Students first practice administering clinical assessment tests in the Cognitive Assessment

course, a mandatory pass/fail course generally taken in a student's second semester at Pacific. (*Id.* ¶ 7.) The Cognitive Assessment course requires students to demonstrate "basic competence in administering, scoring, interpreting, and communicating the results of the Wechsler Adult Intelligence Scale (WAIS-IV) and Woodcock Johnson test batteries." (*Id.* ¶ 7.) Both test batteries contain subtests that may require the test administrator to utilize "fine motor skills" to perform such tasks as manipulating and arranging plastic blocks as directed by a scoring manual, slashing through a "yes" or "no," making a mark in a particular square, turning pages, or reading information in a specific time sequence. (*Id.* ¶ 9.) Additionally, students administering the test batteries typically do so while holding a notepad, pencil, and stopwatch. (*Id.*) In the accompanying Cognitive Assessment lab, students must demonstrate their ability to properly administer both test batteries. (*Id.* ¶ 8.)

Though learning to properly administer clinical assessment tests is an important facet of Pacific's PsyD program, not all clinical psychologists personally administer the relevant test batteries in practice. (Decl. of Dr. Wayne Adams, ECF No. 80 ("Adams Decl."), ¶ 12.) Instead, practicing psychologists sometimes employ a graduate-level psychological professional, known as a psychometrist, to administer some or all of the relevant test batteries and related subtests. (*Id.*) A psychometrist provides valid test results to the licensed professional, who then interprets the data and integrates the findings into established patient histories. (*Id.*) Thus, while knowing how to administer clinical assessment tests is helpful in interpreting the raw data gathered from various test batteries, it is not necessarily a skill utilized by every clinical psychologist in practice. (*Id.*)

### 3.    *The Internship Requirement*

The internship requirement, which is generally fulfilled in the fifth year of the PsyD program, is the final clinical experience students must pass to earn a PsyD degree. (Brems Dep. 57:6–8.) The

internship requirement is mandated by the American Psychological Association ("APA") and most licensing boards nationwide, and consists of a full-time clinical experience outside of the SPP campus. (*Id.* 57:10–14.) All internships available in a given year are coordinated through a national online match process. (*Id.* 57:15–20.) PsyD students attending Pacific must apply for and secure internships through the online match process, and Pacific does not play an active role in placing students at particular internship sites. (*Id.* 57:21–24; Dep. of Dr. Genevieve Arnaut ("Arnaut Dep.")[4] 47:12–17.)

Each internship experience is uniquely tailored to the needs of the specific site. For example, "[t]here may be sites that are wholly [dedicated to] assessment . . . [though] most sites are a combination of assessment and therapy or intervention, and there may be some sites that have very, very minimal assessment and are primarily intervention and therapy." (*Id.* 48:2–7.) The requisite physical and academic qualifications for a given internship site thus are dictated by the individual site, and rest outside of Pacific's control. The independent nature of the internship requirement is often explained in advance to PsyD students at Pacific. (Elder Dep. 130:9–13.)

## II.     Breyer's Application and Admission to Pacific

### *A.     Breyer Applies to the PsyD Program*

Breyer is an individual living with cerebral palsy ("CP"), a congenital condition that substantially affects her motor skills, and causes readily observable speech and muscle impairment. (Breyer Decl. ¶ 2; 2017 Breyer Dep. 56:18–57:1.) After earning bachelor's and master's degrees from Colorado State University ("CSU"), Breyer sought to earn a PsyD degree with the hope of

---

[4] The "Arnaut Dep." is attached as part of Exhibit D to the Stephenson Declaration (ECF No. 85-4, at 26–33).

ultimately practicing forensic psychology. (2017 Breyer Dep. 34:25–35:1.) Breyer's search for potential PsyD programs thus was largely guided by her interest in forensic psychology, and she primarily considered the availability of a forensic track and the program location in deciding where to apply. (*Id.* at 75:12–19.)

In December 2014, Breyer applied to the PsyD program at Pacific.[5] (Richman Decl., Ex. 1, at 45; Breyer Decl. ¶ 2.) Breyer did not formally disclose her disability status, but made several references to her disability throughout her application materials. Her admissions essays, for example, revealed that Breyer received physical therapy and speech therapy after she was diagnosed with CP at the age of nine, and mentioned that she had been "bullied in school due to [her] disability." (Stephenson Decl., Ex. K, at 31–32.) Notably, Breyer explicitly referenced her condition in a letter to the admissions committee that attributed her low scores on the Graduate Record Examination ("GRE") to testing difficulties related to her physical disability. (Stephenson Decl., Ex. K, at 49; 2017 Breyer Dep. 80:19–82:19.) The letter also disclosed that Breyer had received accommodation when she took the GRE — specifically, time-and-a-half to complete the exam. (Stephenson Decl., Ex. K, at 49.)

Breyer's application was initially reviewed by a then-current PsyD student and Dr. James Lane ("Dr. Lane"), a professor in the SPP and the Director of the PsyD program's Adult Track. (Decl. of Dr. James Lane in Supp. of Def.'s Mot. for Summ. J., ECF No. 67 ("Lane Decl."), ¶¶ 2, 3; Clark Decl. ¶ 14.) Impressed with Breyer's previous academic experience, both reviewers gave her an "outstanding" rating as to her "research potential," and Dr. Lane gave her an "above average"

---

[5] Breyer also applied to the University of Denver's PsyD program, but was denied admission on January 12, 2015. (Oct. Breyer Dep. 92: 7–14; Richman Decl., Ex. 1, at 55.)

rating with respect to her "clinical potential." (Stephenson Decl., Ex. K, at 69–70; Dep. of James Lane, PhD ("Lane Dep.")[6] 40:9–13; 41:10–12.) Dr. Lane and the student reviewer both recommended that Breyer should be retained in the admissions pool, interviewed in person, and "strongly consider[ed]" for acceptance into the PsyD program. (Stephenson Decl., Ex. K, at 69–70.)

B. Breyer Attends Pacific's Interview Day

Breyer was subsequently invited to attend "Interview Day," an event held at the SPP to provide applicants with an opportunity to learn more about the PsyD program and to engage with current PsyD faculty and students. (Clark. Decl. ¶ 15.) In the weeks preceding Interview Day, Breyer contacted Piper Menke ("Menke"), the Assistant Director of Graduate and Professional Admissions, to request an accommodation for the event. (Richman Decl., Ex. 1, at 54.) Breyer explained that "due to [her] disability," she might require additional time to finish a writing exercise assigned and completed during Interview Day. (Id.) Menke responded immediately, and readily granted Breyer's request for accommodation. (Id. at 53.)

On February 27, 2015, Breyer attended Interview Day at Pacific's campus in Hillsboro, Oregon. (Breyer Decl. ¶ 4.) During her visit, Breyer attended informational sessions about the SPP and sat for formal interviews conducted by two PsyD students and one faculty member. (Id.; 2017 Breyer Dep. 85:13–17; Lane Dep. 43:18–22; Stephenson Decl., Ex. K, at 66–68.) Breyer's interviewers evaluated the substance of her interview using Pacific's interview feedback forms. (See Stephenson Decl., Ex. K, at 66–68.) Both student interviewers gave Breyer "above average," "average," and "outstanding" ratings with respect to her "fit with the program," "relevant

---

[6] The "Lane Dep." is filed as Exhibit A of the Stephenson Declaration (ECF No. 85-1).

(inter)personal characteristics," and "diversity contributions and potential." (Stephenson Decl., Ex. K, at 66–67.) Based on their evaluations, both students recommended Breyer be retained in the admissions pool and "strongly consider[ed for] acceptance" into the PsyD program. (*Id.*) Breyer's faculty interviewer, Dr. Lane, also evaluated Breyer favorably, giving her "average" and "above average" ratings in her "understanding of [a] professional psychologist's role" and "diversity contributions and potential." (Lane Decl. ¶ 4; Stephenson Decl., Ex. K, at 68.)

Dr. Lane, however, struggled to rate Breyer's "clinical potential," an evaluation largely based on whether the applicant "appears capable of forming and maintaining relationships." (Lane Dep. 50:5–8.) In his deposition testimony, Dr. Lane explained that rating an applicant's clinical potential requires, to some degree, a subjective assessment of various interpersonal characteristics such as "tone of voice, the way the person speaks, eye contact, [and] facial expressions." (*Id.* 50:11–15.) While interviewing Breyer, Dr. Lane observed that some of those characteristics "were not under her voluntary control," making it difficult to "judge the emotional content of what she was conveying." (Lane Dep. 50:11–23.) As a result, Dr. Lane did not believe he could fairly or accurately assess Breyer's clinical potential during the short twenty-minute interview, and left that section of the interview feedback form blank. (Lane Dep. 49:24–50:14; 51:7–21; Stephenson Decl., Ex. K, at 68.) He noted at the bottom of the feedback form, however, that Breyer's candidacy needed to be discussed in detail "with advice and counsel" from his colleagues. (Stephenson Decl. Ex. K, at 68; Lane Dep. 51:25–52:10; Lane Decl. ¶ 7.) Dr. Lane did not make a recommendation as to whether Breyer should be admitted to the PsyD program.

C.    *Faculty and Staff Discuss Dr. Lane's Concerns*

Dr. Lane, having observed the "presence and degree of [Breyer's] disability," developed

concerns about her ability to complete the PsyD program. (Lane Dep. 50:24–51:21; 53:15–24.) Dr. Lane shared his observations with the admissions committee and the Dean of the SPP, Dr. Christiane Brems ("Dr. Brems"), expressing apprehension about Breyer's "capacity to carry out some of the physical and communication skills" required of students in the SPP. (Decl. of Dr. Christiane Brems in Supp. of Def.'s Mot. for Summ. J., ECF No. 66 ("Brems Decl."), ¶¶ 2, 4; Dep. of Christiane Brems, PhD ("Brems Dep.")[7] 41:16–42:10.) Specifically, Dr. Lane shared his concerns about "how potential clients might respond" to Breyer, and whether the "[s]peed . . . and articulateness of her communication" would make it difficult for her to complete intake assessments in the SPP clinic in a timely manner or to screen prospective clients over the phone. (*Id.* at 55: 17–25, 56:8–10.) In light of the concerns raised by Dr. Lane, Dr. Brems determined it was necessary to "explore how [Pacific] would need to support [Breyer] . . . to help her be successful" if admitted to the PsyD program. (Brems Dep. 43:1–10.)

Soon thereafter, Dr. Brems consulted Dr. Ann Barr-Gillespie ("Dr. Barr-Gillespie"), Pacific's Vice Provost and Executive Dean of the College of Health Professionals, and Dr. Mark Ankeny ("Dr. Ankeny"), Pacific's Vice President of Student Affairs, about Breyer's application. (Stephenson Decl., Ex. N.) Specifically, Dr. Brems explained that an SPP applicant had "functional impairments that call in [to] question whether she can perform all essential functions listed for the PsyD program without significant accommodation." (*Id.* at 4.) Dr. Brems sought clarification of Pacific's legal obligations under such circumstances, and expressed concern that the SPP did not have the resources necessary "to provide all the accommodations . . . this student would [potentially] require" if

---

[7] The "Brems Dep." is attached as Exhibit B to the Stephenson Declaration (ECF No. 85-2) and as Exhibit 12 to the Oct. Richman Declaration (ECF No. 93-7).

admitted. (*Id.*) The record indicates that SPP administrators shared similar concerns as to whether the SPP or the wider university administration would bear the financial responsibility of providing necessary accommodations once Breyer was admitted. (Stephenson Decl., Ex. K, at 272.)

On March 11, 2015, members of the admissions committee, Pacific and SPP administrators, the Director of Pacific's Learning Support Services ("LSS"), and the SPP's recruiting specialist (collectively, "the group"), attended a meeting to discuss Dr. Lane's concerns about Breyer's ability to perform the essential functions, particularly with respect to clear communication and the administration of clinical assessments. (Brems Decl. ¶ 5; Brems Dep. 44:20–45:4, 46:17–25; Dep. Of Katherine Elder, PhD ("Elder Dep.")[8] 73:19–74:13.) Unsure Breyer "knew the extent to which verbal communication and fine motor skills would be part of the required training," the group determined Breyer should be provided with information about the essential functions required of students in the PsyD program. (Elder Dep. 84:10–17; Dep. of Kim Garrett ("Garret Dep.")[9] 49:16–25.) To that end, Dr. Katherine Elder ("Dr. Elder"), a professor in the SPP, and Kim Garrett ("Garrett"), the Director of LSS, were tasked with calling Breyer to discuss the essential functions.

The Group's decision to have a follow-up conversation with Breyer to discuss the essential functions generally deviated from Pacific's standard admissions practices. Historically, the essential functions document has been distributed via the admissions packet, and Pacific has not otherwise shared or discussed the essential functions with prospective students prior to admission. (Dep. Of

---

[8] The "Elder Dep." is attached as part of Exhibit 2 to the July Richman Declaration (ECF No. 64-2, at 1–12), as Exhibit F to the Stephenson Declaration (ECF No. 85-6), and as Exhibit 8 to the Oct. Richman Declaration (ECF No. 93-3).

[9] The "Garrett Dep." is attached as part of Exhibit 3 to the July Richman Declaration (ECF No. 64-3, at 1–7) and as Exhibit G to the Stephenson Declaration (ECF No. 85-7).

Jennifer Clark, PhD dated Mar. 23, 2018 ("2018 Clark Dep.")[10] 51:17–52:1; 59:1–17.) None of Pacific's policies or procedures, however, explicitly prohibited the timing or content of the conversation proposed. (*Id.* 55:6–10, 57:3–59:17.) Rather, when interaction with an applicant raises questions about his or her ability to perform the essential functions, the steps taken to determine whether the applicant has the requisite functional ability to complete the PsyD program "can take whatever form" is most helpful under the circumstances. (*Id.* 58:1–25.)

> D.    *The March 12, 2015 Phone Call*

On March 12, 2015, Dr. Elder emailed Breyer and requested to "talk by phone as a follow-up to [her] interview . . . at Pacific." (Declaration of Taylor D. Richman in Supp. of Def.'s Mot. for Summ. J. dated July 20, 2018, ECF No. 64 ("July Richman Decl."), Ex. 1, at 57.) Dr. Elder explained that the purpose of the call was to have a detailed discussion about the essential functions required of graduate students in the SPP, and specified that she and Garrett would be on the call. (*Id.*) Breyer agreed.

Breyer, Dr. Elder, and Garrett spoke by phone later that day. (2017 Breyer Dep. 94:3–22; Stephenson Decl., Ex. K, at 72–74.) Notes taken by Dr. Elder during the phone call confirm the essential functions were discussed, including physical requirements that implicated the use of "fine motor skills" in the PsyD program and beyond. (Stephenson Decl., Ex. K, at 72.) Dr. Elder specified in her deposition testimony that she sought to make Breyer "very aware of what types of motor skills would be involved in not only [the PsyD] practica, but future practica outside of Pacific," especially with regard to clinical testing. (Elder Dep. 108:4–16.) Dr. Elder also explained

---

[10] The "Mar. Clark Dep." is attached as part of Exhibit D to the Stephenson Declaration (ECF No. 85-4, at 5–25).

the importance of clear communication, and its role in clinical psychology. (Stephenson Decl., Ex. K, at 72.) Lastly, Dr. Elder reviewed the internship requirement, of which Breyer knew "little" or just the "basics." (*Id.* at 72–73.) Dr. Elder sought to clarify that internships are completed outside of the PsyD program, thus divesting Pacific of control over student placement and the specific qualifications, physical or otherwise, required for any given internship experience. (Elder Dep. 125:15–126:8.) Toward the end of the call, Garrett attempted to decipher what accommodations Breyer might need if she was admitted to the PsyD program, asking whether Breyer had previously utilized a personal assistant and whether she had been formally evaluated by a doctor to determine what accommodations were necessary in an academic environment. (Stephenson Decl., Ex. K, at 73; Garrett Dep. 61:4–14.)

Dr. Elder's notes reveal that Breyer was receptive to the substance of the phone call. Though she acknowledged that certain physical requirements could pose somewhat of a challenge, she otherwise expressed confidence in her abilities. (Stephenson Decl., Ex. K, at 72.) Breyer explained that clear communication, both in person and over the phone, did not present a significant problem, and stressed that she felt comfortable interacting with children and adults alike. (*Id.*) Further, Breyer opined that interactions with children could result in "teachable moments." (*Id.*)

Breyer's recollection of the phone call, however, differed from that of Elder and Garrett. During her deposition, Breyer testified that the phone call was not about the essential functions of the PsyD program, but "was more of an interrogation of whether or not [she] could do certain activities." (2017 Breyer Dep. 94:23–95:3.) For example, Breyer could not recall discussing the "physical requirements" of the PsyD program, alleging Dr. Elder merely asked if she could "rearrange blocks." (*Id.* 96:7–14.) Breyer also did not remember discussing the essential functions

of speaking clearly with clients and communicating with clients over the phone, recalling only that Dr. Elder had asked "something to the effect like, 'How do you expect the clients to understand you considering your physical disability?'" (*Id.* 96:18–97:3.) Breyer likewise did not remember Dr. Elder identifying the internship requirement as an essential function, or discussing the process of student placement. Rather, she recalled only that Dr. Elder had questioned how she would obtain an internship in light of her disability. (*Id.* 97:6–23.) Though Breyer insists her recollection of the phone call is accurate, she acknowledged in her deposition testimony that she was paraphrasing the conversation because she could not remember the specific words or phrases used by Dr. Elder. (*Id.* 97:4–5, 10–12, 24–25.)

### E. Breyer is Admitted to the PsyD Program

Immediately after the March 12, 2015 phone call, Dr. Elder emailed Breyer a copy of the essential functions document, as well as two clinical testing videos to help illustrate the requisite motor skills involved in administering clinical assessment tests. (Stephenson Decl., Ex. K, at 81.) Breyer responded, explaining that she had discussed the phone call with her CSU thesis advisor, who had expressed doubts that the administration of particular assessment tests was an essential function of the PsyD program. (*Id.* at 80–81.) She also noted that they discussed what she believed were Dr. Elder's concerns: fine motor skills related to setting up and administering specific clinical assessment tests, how children and adults respond to her disability, how she handles people who cannot understand her on the phone, and how she would obtain an internship with her disability. (*Id.* at 80.) Citing her demonstrated ability to "thrive[] and flourish[] under many different academic and professional settings," Breyer confirmed she had reviewed the essential functions and felt confident she could "maintain those standards with or without accommodation afforded to [her] by law." (*Id.*

PAGE 20 - OPINION AND ORDER

at 81.)

Shortly thereafter, Dr. Elder emailed a summary of the March 12 phone call to the group. Dr. Elder advocated for Breyer's admission to the PsyD program, reasoning that "all students are taking a chance [] they will be able to meet the challenges of our graduate program, and as long as she signs the essential functions, it would be hard for us to assume we could predict success/failure better in this case than in others." (*Id.* at 78.) She acknowledged, however, that the "complexity of [Breyer's] case" might require the admission decision to rest with more than one person. (*Id.* at 77.) Several of Dr. Elder's colleagues agreed with her overall assessment, and Pacific officially offered Breyer admission to the SPP in the Adult Psychology Track on March 19, 2015. (*Id.* 76–79, 83; SAC ¶ 23.)

*F.    Dr. Genevieve Arnaut Seeks Guidance About Accommodating Breyer*

On March 20, 2015, Dr. Genevieve Arnaut ("Dr. Arnaut"), the SPP's Director of Clinical Training, contacted Dr. Alette Cobble-Temple ("Dr. Cobble-Temple"), a faculty member at the John F. Kennedy University College of Psychology who lives with CP. (Stephenson Decl., Ex. K, at 182; Decl. of Dr. Allette Cobble-Temple, ECF No. 82 ("Cobble-Temple Decl."), ¶¶ 1, 7.) In light of Breyer's admission to the SPP, Dr. Arnaut requested "any input, ideas, or resources" regarding the types of accommodations that might help a student with CP succeed in a PsyD program. (Cobble-Temple Decl., Ex. 100, at 2–3.) Dr. Cobble-Temple suggested a variety of measures — including different methods of accommodating the administration of clinical assessment tests — that could be beneficial depending on the severity and circumstances of the student's CP. (Cobble-Temple Decl., Ex. 100, at 1.) Dr. Cobble-Temple expressed her willingness to "provide further guidance" if needed, but she received no further contact from Dr. Arnaut or anyone else at Pacific. (Cobble-

Temple Decl. ¶ 8.)

G.      *Breyer Accepts Pacific's Offer of Admission*

Breyer was "very proud" to be accepted into a competitive program, but "had mixed feelings" about her acceptance to Pacific due to the March 12 phone call. (2017 Breyer Dep. 104:20–2015:8.) She thus considered whether to accept admission by reviewing Pacific's website and consulting friends and colleagues. (*Id.* 105:9–107:24.) Based on Pacific's website and her experience at interview day, Breyer concluded that Pacific was "very committed to diversity." (*Id.* at 105:9–25.)

On May 12, 2015, Breyer contacted Dr. Elder with her decision to accept admission to the PsyD program. *Id.* Breyer explained that the decision had required significant thought due to the "how the issue of diversity was handled" during the admissions process, but that she had since determined that pursuing her professional goals was more important than her concerns about the March 12 phone call. (*Id.*) She nevertheless requested an in-person discussion with Dr. Elder about the phone call after she arrived on campus in August 2015. (*Id.*) Breyer also stated that she had "already [identified] three potential sites for internships" on recommendations from her neurologists in Colorado, and inquired as to the steps necessary "to get those places ready to go for an internship[.]" (*Id.*)

Two days later, Breyer emailed Dr. Tamara Tasker ("Dr. Tasker"), the Director of Academics, seeking to substitute "life experience" in lieu of a required human diversity class. (Stephenson Decl., Ex. K, at 10–11, 173.) She explained that she had "made it [her] life's mission to work with and educate [herself] on human diversity issues," and that "experiencing how the [PsyD] program handled the issues of diversity in regards to [her] needs" had caused her to "question [her] use of time in [the human diversity] class." (*Id.*) Specifically, Breyer concluded that she would

be uncomfortable "taking this class from Pacific knowing that faculty members asked [her] insulting and illegal questions" during the phone call on March 12. (*Id.*) In response to Breyer's complaints, Dr. Elder, Dr. Tasker, Dr. Lane, and Dr. Brems met to discuss the issues identified, and determined it was necessary to meet with Breyer as soon as possible after the fall term began. (Elder Dep. 171:9–172:18.)

III.    Breyer's Attendance at Pacific

    *A.    Breyer Requests and is Granted Accommodations*

    Breyer relocated to Hillsboro, Oregon with her husband, where she began attending classes at Pacific's professional campus on August 31, 2015. (Oct. Breyer Dep. 110:19–111:2; SAC ¶ 35.) Soon after classes commenced, Breyer approached two of her professors to request accommodations for her disability. (Deposition of Rebekah Breyer dated Mar. 7, 2018 ("2018 Breyer Dep.")[11] 150:5–24, 152:9–25.) Both professors explained that Pacific policy required coordination and approval of all accommodations through LSS, and directed Breyer to contact LSS to make a formal request. (Clark Decl. ¶ 25; Dep. of Dr. Genevieve Arnaut dated April 6, 2018 ("Apr. 6 Arnaut Dep.")[12] 73:20–23; Mar. Breyer Dep. 150:18–153:18.)

    On September 8, 2015, Breyer requested a meeting with Garrett to discuss disability services. The meeting occurred two days later on September 10, 2015. (July Richman Decl., Ex. 3, at 35.) Breyer protested the required use of formal channels to arrange her accommodations, explaining that

---

    [11] The "Mar. Breyer Dep." is attached as part of Exhibit 1 to the July Richman Declaration (ECF No. 64-1, at 17–44), as part of Exhibit C of the Stephenson Declaration (ECF No. 85-3, at 14–36), and as part of Exhibit 10 to the October Richman Declaration (ECF No. 93-5, at 9–11).

    [12] The "Apr. 6 Arnaut Dep." is attached as Exhibit H to the Stephenson Declaration (ECF No.85-8) and as Exhibit 11 to the October Richman Declaration (ECF No. 93-6).

other educational institutions had allowed her to simply take additional time on exams as needed. (*Id.* at 31.) Garrett explained the necessity of coordinating all accommodations through LSS, which Breyer appeared to understand. (*Id.*) They then discussed various accommodations Breyer might need, including an assigned note-taker, time-and-a-half on exams, the ability to secure an extension on assignments if necessary, and reserved parking adjacent to the building where she attended classes. (*Id.* at 28, 31.) Garrett later emailed Breyer to confirm that the accommodations discussed were sufficient to meet her needs. (*Id.* at 28.) Breyer requested double time instead of time-and-a-half to complete exams, but otherwise confirmed the proposed accommodations "look[ed] good." (*Id.* at 26.) Garrett thereafter approved all accommodations requested, including double time on exams. (*Id.* at 24–25.)

B.    *Breyer Requests and Attends a Meeting to Discuss the March 12, 2015 Phone Call*

Soon after the start of classes, Breyer also requested a meeting with Dr. Elder to discuss the March 12 phone call, which she felt had been "insensitive," "humiliating," "ableist," and "focused solely on [her] disability." (2017 Breyer Dep. 113:11–115:11.) She subsequently met with Dr. Elder, Dr. Tasker, and Dr. Brems on September 14, 2015, and described the ways in which the March 12 phone call had been problematic, going so far as to opine that several questions asked of her had been illegal. (2017 Breyer Dep. 111:19–112:3, 112:22–113:10; Elder Dep. 175:1–13, 175:22–176:13; Breyer Decl. ¶ 7.) Breyer explained that the wording of specific questions had been insensitive, and provided instruction as to how each question could have been asked in a more sensitive form. (*Id.* 117:21–118:1.) She stressed that she did not take issue with discussing her disability, but simply wished to do so in "a more sensitive" and "educated" manner. (*Id.* 118:15–25.) Drs. Elder, Tasker, and Brems "seemed to be open and . . . mindful about what [she] was saying,"

but allegedly admitted to having no training or knowledge concerning the ADA. (Elder Dep. 177:23–178:8; Oct. Breyer Dep. 119:4–8; Breyer Dep ¶ 7.) After the meeting, Dr. Brems, in her capacity as the Dean of the SPP, took no further action to investigate the substance of the March 12 phone call. (Brems Dep. 79:8–11.)

C.    *Breyer Meets with Dr. Tram*

Breyer's first-semester coursework included Basic Clinical Skills, a class and accompanying lab which teaches students practical skills such as empathy, listening, proper non-verbal behavior, and how to deal with difficult clients. (Decl. of Dr. Jane Tram in Supp. of Def.'s Mot. for Summ. J., ECF No. 68 ("Tram Decl."), ¶¶ 3,4.) The class is primarily centered on counselor-client roleplay and student feedback, and the quality of the feedback given by each student is factored into his or her final grade. (*Id.*)

On September 17, 2015, Dr. Tram, the Basic Clinical Skills professor, asked to meet with Breyer after other students expressed difficulty evaluating her performance during the roleplay sessions. (July Richman Decl., Ex. 1, at 67–68; Tram Decl. ¶ 5.) The students explained that they ordinarily focused their feedback on an individual's "clarity of speech or extraneous movements," but that such feedback was not helpful in Breyer's case because she lacked control over certain verbal and non-verbal cues. (*Id.*) Several of Breyer's classmates thus sought guidance as to how they could provide her with higher quality feedback during future sessions. (*Id.*) Because Dr. Tram "believed it was important to address these concerns in a way that would result in a positive learning experience" for all involved, she waited to speak with Breyer before providing any guidance on the subject. (*Id.* ¶¶ 6,7.)

On September 21, 2015, Breyer met with Dr. Tram, who relayed the concerns reported by

PAGE 25 - OPINION AND ORDER

Breyer's classmates. Breyer alleges Dr. Tram asked her to speak with the class about her disability because she did not want other students "to be afraid of giving [her] real critical critique during [the] mock therapy sessions," and thought it would be helpful for the other students to "know what is normal about [her] and what is not normal about [her]." (2018 Breyer Dep. 142:14–143:4.) Breyer admittedly could not recall, however, if those were the exact words or phrases used by Dr. Tram. (*Id.* 142:3–7.) Dr. Tram maintains that she simply asked Breyer if she would like to address the issue with the class herself rather than having the substance of their conversation communicated second-hand. (*Id.* ¶ 8.)

The next day, Breyer sent an email to Dr. Tram which read, in relevant part:

> After careful consideration of your suggestion that I address my disability in class and on the advi[c]e of my legal [counsel], I am not willing to talk to the class on Thursday. If you feel that it is appropriate to reiterate that nobody should discriminate against their classmates generally and when giving feedback on the basis of sex, disability, race, color, national origin, sexual orientation, age, religious preference, disabled veteran or Vietnam era status please do so.

(Richman Decl., Ex. 1, at 69; Tram Decl. ¶ 9.) Dr. Tram responded the same day, emphasizing that her intention had been only to "enhance the quality of the feedback" provided by the other students. (*Id.*)

### D.   *Breyer Requests and Attends a Meeting with Dr. Clark*

Shortly after the meeting with Dr. Tram, Breyer requested a meeting with Dr. Jennifer Clark, the Director of the PsyD program, to discuss research ideas for a class assignment. (Stephenson Decl., Ex. K, at 182; 2018 Breyer Dep. 198:5–24.) During the meeting, Breyer raised concerns about her interactions with Dr. Tram, and stated that her performance had never been questioned solely on the basis of her disability during her previous academic career. (*Id.* 199:16–200:10, 203:9–15.)

Breyer recounted her discussion with Dr. Tram regarding student feedback, and complained that Dr. Tram had since suggested she provide clients with a note card explaining her disability and affirming her competence as a psychologist before speaking with them. (*Id.* 145:2–146:13.) Notes taken by Dr. Clark during the meeting indicate Breyer felt Dr. Tram's actions "c[a]me from a good place," but that she thought some aspects of those actions were likely illegal. (Stephenson Decl., Ex. K, at 103; Clark Dep. 95:10–96:20.) Breyer again raised her concerns about the March 12 phone call, and asked Dr. Clark if she needed to provide her professors with a copy of her resume to prove she was capable of becoming a psychologist. (2018 Breyer Dep. 167:10–20, 168:14–24.) Dr. Clark appeared to be "genuinely concerned about the treatment [Breyer] was receiving by her faculty," and assured her such measures were unnecessary. (*Id.* 167:21–25.)

That same day, Dr. Clark asked Breyer to share her concerns with Dr. Tasker. Breyer obliged, presenting Drs. Clark and Tasker with a list of issues she had compiled regarding her overall experience with Pacific and its faculty. (*Id.* 168:14–24; Stephenson Decl., Ex. K, at 147.) Both Dr. Clark and Dr. Tasker were receptive to Breyer's concerns, and reviewed the list with her point-by-point. (*Id.* 210:20–211:3.) By the end of the meeting, Dr. Tasker and Dr. Clark both agreed "they should work more on ADA laws," and asked Breyer if she would like them to address her concerns with Dr. Tram. (2018 Breyer Dep. 170:3–12.) Breyer declined, directing Dr. Clark and Dr. Tasker not to speak with Dr. Tram because she "did not want to get her into trouble." (*Id.* 170:6–8.)

*E.     Breyer Meets with Drs. Arnaut and Li*

During a class discussion in early October 2015, Breyer commented that Pacific had not been supportive of her needs in relation to her disability. (2018 Breyer Dep. 155:17–21, 213:20–22; Apr. 6 Arnaut Dep. 111:8–14.) The comment troubled Dr. Arnaut, who was leading the discussion, and

she requested that Breyer meet with her and the SPP Director of Human Diversity, Dr. Susan Li ("Dr. Li"), to discuss her concerns. (2018 Breyer Dep. 213:23–214:4.)

On October 12, 2015, Breyer met with Dr. Arnaut and Dr. Li. (*Id.* 155:17–24, 214:1–216:12; July Richman Decl., Ex. 1, at 73–80.) Several of Breyer's concerns were discussed during the meeting, including the March 12 phone call, the incident with Dr. Tram, and Breyer's opposition to the structured approval of accommodations through LSS. (Apr. 6 Arnaut Dep. 120:25–121:5; 2018 Breyer Dep. 216:7–12; July Richman Decl., Ex. 1, at 71–80.) Breyer also recounted the substance of her previous meeting with Dr. Clark, and explained that she had declined Dr. Clark's offer to speak with Dr. Tram because she wished to handle issues with particular faculty members on her own. (2018 Breyer Dep. 217:11–14.)

Instead of focusing on her concerns, Breyer claims Dr. Li took the opportunity to raise concerns about certain requirements of the PsyD program, particularly the clinical assessment courses, practicums, and internships. (*Id.* 220:22–221:6.) Dr Li explained, for example, that "standardized testing may require timed administration and manipulation of materials, and [that] any nonstandard administration might result in unreliable and invalid test results." (Richman Decl., Ex. 1, at 77.) Dr. Li also asked whether Breyer was "able to hold a stopwatch, a clipboard, and a pen all at the same time" as required by certain test batteries. (2018 Breyer Dep.. 222:9–16.) Drs. Li and Arnaut noted that students did not have to conduct clinical assessment testing until the Cognitive Assessment course began the following semester, but suggested Breyer review videos of valid test administrations to learn more about the testing process. (*Id.* 222:17–20, 223:1–12.) Dr. Li also reviewed the internship requirement, stressing Pacific's lack of control over student placements and any physical dexterity and speed of movement requirements that might be in place at various

internship and practicum sites. (*Id.* 221:10–13; Richman Decl., Ex. 1, at 77–78.) They concluded the meeting with a plan to have Dr. Clark serve as Breyer's point of contact regarding the issues raised, and any other issues that might arise in the future. (2018 Breyer Dep. 222:22–25; Richman Decl., Ex. 1, at 78.)

Breyer later sent an email alleging that the real purpose of the meeting was to question her abilities, not to discuss her experience at Pacific. (July Richman Decl., Ex. 1, at 78–80; 2018 Breyer Dep. 182:23–183:17.) Breyer alleged Dr. Li had immediately asked whether the PsyD program was the right fit for her, and that during the conversation that followed, neither Dr. Li nor Dr. Arnaut expressly asked about her concerns. (2018 Breyer Dep. 214:5–216:9; July Richman Decl., Ex. 1, at 71; Dep. of Susan Li, PhD ("Li Dep.")[13] 81:11–82:3.) Breyer further alleged that Dr. Li had asked what other universities had to say about her disability, and had stated that she would not feel comfortable recommending Breyer to practicum sites because she did not know if Breyer could perform the work required. (July Richman Decl., Ex. 1, at 72; Li Dep: 67:21–68:19, 73:15–75:2.) Breyer concluded the email by "encourag[ing] the program to look at the ADA laws and take note of how many laws the program has broken since March." (July Richman Decl., Ex. 1, at 73.)

In response to Breyer's allegations, Dr. Brems provided her with an overview of Pacific's formal student grievance procedure. (*Id.* at 81.) Dr. Brems noted that "a disagreement about how matters are handled does not necessarily rise to the level of discrimination," but nevertheless urged Breyer to submit her concerns regarding ADA compliance in writing to Will Perkins, the Dean of Students ("Dean Perkins"), which would trigger a formal investigation. (*Id.*) Breyer never contacted

---

[13] The "Li Dep." is attached as Exhibit 4 to the July Richman Declaration (ECF No. 64-4) and as Exhibit J of the Stephenson Declaration (ECF No. 85-10).

Dean Perkins or otherwise sought to engage Pacific's formal process for reporting discriminatory

conduct. (2018 Breyer Dep. 219:25–220:12.)

> F.  *Breyer Requests and Attends a Meeting with Drs. Clark and Arnaut, Who Create a Formal Action Plan*

Three days later, on October 15, 2015, Breyer sent an email to Dr. Clark that explained, in

relevant part:

> I am having serious doubts about my abilities right now due to all the professors['] concerns. I am wondering if I should continue with the program or not. I want to be open to these concerns and not be defensive any[more]. I want to be able to talk to you in person and have an open and honest discussion about my abilities. It would be good to have Dr. Arnaut there at the meeting because she knows what the practicum sites require and are looking for in people. You are the people I trust right now to provide me with an objective insight into these matters . . . .
>
> I want to get this resolved soon because it is greatly impacting my abilities to study for midterms. I think Dr. Li did make a good point when she suggested I have a clearer understanding of the work of a psychologist before I do waste any more time or money and maybe look into other avenues.

(Richman Decl., Ex. 1, at 98–99.)

On October 19, 2015, Breyer met with Dr Clark and Dr. Arnaut to discuss "all of the

remaining program requirements and to assess if completing [the PsyD] program [was] realistic for

her." (Stephenson Decl., Ex. K, at 91.) During the meeting, Drs. Clark and Arnaut explained the

various requirements of the PsyD program, particularly the internship requirement and "the

challenges [Breyer] may face securing placement in an already competitive field." (*Id.*) They also

discussed the role of clinical assessment testing in Breyer's training, the kinds of accommodations

that might be necessary for Breyer to complete her first assessment course, and the SPP's need to

evaluate whether using nonstandard procedures in the administration of standardized assessment

tests would impact the validity of the results. (*Id.*) Though unsure, Breyer speculated that she might

need an accommodation to complete the Cognitive Assessment course. (2018 Breyer Dep. 230:13–22.)

They also discussed Breyer's career goals, particularly her desire to advocate for clients in the court system as a forensic psychologist. Drs. Clark and Arnaut clarified that the roles of a forensic psychologist and an advocate in the criminal justice system are separate and distinct, and that being an advocate does not require a PsyD or training in forensic psychology. (2018 Breyer Dep. 228:14–229:4; Dep. of Jennifer Clark, PhD dated Nov. 14, 2017 ("2017 Clark Dep.")[14] 47:7–48:3; Stephenson Decl., Ex. K, at 91.) Further, they explained that forensic placements in state hospitals or correctional institutions tend to have more rigorous mobility requirements due to heightened safety concerns, and that Breyer's disability could "limit the feasibility of acceptance at these placements." (Stephenson Decl., Ex. K, at 91.) Dr. Arnaut also opined "that forensic assessment as a specialty area would likely not be amendable to non-standardized administration of tests due to the purpose of the assessments being court related." (*Id.*)

By the end of the meeting, Dr. Arnaut, Dr. Clark, and Breyer discussed and agreed to the following action plan to determine appropriate accommodations for the Cognitive Assessment course:

> Dr. Clark is going to seek out a video of test administration of IQ and other measures so that Rebekah can gain a greater understanding of the task.

> Dr. Clark will gather information on accommodations utilized for prior students in the assessment course.

> Dr. Arnaut will explore literature and other schools' policies about the scope of acceptable accommodations for standard administration of measures.

---

[14] The "2017 Clark Dep." is attached as Exhibit E to the Stephenson Declaration (ECF No. 85-5) and Exhibit 9 to the October Richman Declaration (ECF No. 93-4).

Drs. Clark and Arnaut will initiate discussion with faculty about SPP's view on allowable testing accommodations (e.g., does student have to administer all subtests herself?)

(*Id.*; 2018 Breyer Dep. 231:16–232:18.)

Following the meeting on October 19, 2015, Dr. Clark "believed it was important for the PsyD program to deeply consider whether it was essential to the learning objectives of the assessment course for students to actually administer" all subtests associated with a particular assessment test, and began consulting other faculty members regarding possible alternatives. (Clark Decl. ¶¶ 18, 19.) Because determining whether suitable alternatives exist was "a complex curricular decision" requiring time and consideration, SPP faculty believed it was imperative to discuss and determine appropriate accommodations before Breyer began the Cognitive Assessment course the following semester. (*Id.* ¶ 21.) Breyer, however, had been discouraged, and felt that her meeting with Drs. Clark and Arnaut had provided "more obstacles and doubt." (Breyer Dep. ¶ 10.) Consequently, Breyer suspected the prolonged and involved process of determining the feasibility and appropriateness of various accommodations was intended to discourage her from continuing the PsyD program. (*Id.*)

G.   *Breyer Requests that Pacific Provide an Assistant*

On October 24, 2015, Breyer contacted Dr. Clark and requested that she be provided with an assistant "trained in psychological assessments to help [her] get through classes and practicum sites[.]" (Richman Decl., Ex. 1, at 104.) Breyer had read that professional psychologists often hire assistants to do a variety of tasks, including administering clinical assessment tests, and explained that she similarly intended to hire an assistant once in practice. (*Id.*) Accordingly, Breyer indicated she preferred to have an assistant over any other accommodation that might be provided, and

reasoned that having such "a person to help people with different needs would be a good asset to the program for now and in the future." (*Id.*) Breyer stated they would otherwise need "to meet for an exit plan" if an assistant could not be provided, citing the negative impact the situation was having on her studies. (*Id.*)

On October 25, 2015, Dr. Clark responded, in relevant part:

Yes, psychologists in practice often do use psychometricians to administer tests – we discussed this when we last spoke. The issues that we, as a faculty, need to discuss and explore are those outlined in [the follow-up plan discussed at the October 19 meeting] . . . .

Once we determine what accommodations would be allowable and acceptable for student training, we can then explore how to support you in your academic and practicum training. It is my plan to address/discuss these issues on Monday with involved faculty.

(Richman Decl., Ex. 1, at 103.) In conclusion, Dr. Clark stated she would be available if Breyer wished to check in during the decision-making process. (*Id.*)

Breyer responded the same day, and insisted that "having a person to help administer the tests would cut out all the other steps" outlined in the previous action plan. (*Id.* at 102–03.) In response, Dr. Clark reiterated that SPP faculty needed to assess "what accommodations we have used in the past and what role you would need to play in [test] administration to pass the course." (*Id.* at 102.)

*H. Breyer Meets with Dr. Clark and Withdraws from Pacific*

On October 26, 2015, Breyer again met with Dr. Clark. (2018 Breyer Dep. 238:16–239:5.) Dr. Clark informed Breyer that she had consulted LSS about her request for an assistant, which had determined the use of an assistant was an allowable accommodation. Garrett, however, had determined that an assistant constituted a "personal service" for which Breyer would be financially responsible. (*Id.* 148:15–149:5, 239:6–10; 2017 Clark Dep. 64:1–6, 74:24–75:12; Stephenson Decl.,

Ex. K, at 101.) Dr. Clark also addressed Breyer's stated career goal of practicing forensic psychology, clarifying that though she could complete some forensic course work, the PsyD program could not guarantee "the support necessary" for Breyer to complete the forensic training requirements because she had not been admitted to the Forensic Track. (2018 Breyer Dep. 239:11–22; Stephenson Decl., Ex. K, at 101.) Dr. Clark reiterated, however, that Breyer could continue her education in the Adult Psychology Track, and if she so chose, could utilize an assistant to complete the test administration requirements in the assessment course work and practicum training, but at her own expense. (2018 Breyer Dep. 239:23–240:3; Stephenson Decl., Ex. K, at 101.) Breyer subsequently revealed that she had failed two midterm exams, and attributed her performance to a lack of focus caused by "the stress [she was] experiencing related to . . . [her] enrollment in the program." (2018 Breyer Dep. 240:4–6; Stephenson Decl., Ex. K, at 101.)

In light of the issues discussed with Dr. Clark, Breyer decided to withdraw from the PsyD program to pursue other career goals. (2018 Breyer Dep. 240:7–9; Stephenson Decl., Ex. K, at 101.) Dr. Clark offered Breyer additional assistance, and indicated the faculty could provide her with "consultation about other paths to working within a legal setting and providing advocacy and or mental health services." (2018 Breyer Dep. 240:10–15; Stephenson Decl., Ex. K, at 101.) Dr. Clark later provided Breyer with the necessary paperwork to complete her withdrawal from the PsyD program, and again offered any additional assistance Breyer might need. (Stephenson Decl., Ex. K, at 101.)

On November 3, 2015, Breyer formally withdrew from the PsyD program at Pacific. (Stephenson Decl., Ex. K, at 102.) On the official withdrawal form provided by Dr. Clark, Breyer explained the reasons for her withdrawal as follows:

> After 8 weeks into classes, I discovered I would have to provide for my own accommodations for the psychological evaluation classes and for practicum sites. After considering this fact, I decided it would be almost impossible to complete the program without the support I need. Also, I am not able to [perform] at my best at this university because I have been questioned by many different SPP fac[ulty] about my abilities to be a psychologist and they have suggested I should go into different programs to reach my career goals.

(*Id.*) Breyer allegedly felt she had no choice but to withdraw from the PsyD program. (Breyer Decl. ¶ 12.)

On November 5, 2015, Dr. Clark emailed Breyer "regarding inaccuracies in [her] withdrawal statement." (*Id.*; Clark Decl., Ex. 1.) With respect to Breyer's assertion she would have to provide for her own accommodations, Dr. Clark responded:

> As you know, we did discuss that you would be responsible for the cost of a personal aide that is specific to your needs to fulfill essential functions. As you also know, there have been multiple other discussions, including with Learning Support Services, regarding a variety of other auxiliary aids available from the University to assist you in effectively participating in the program. We have repeatedly sought to engage you in meaningful discussions regarding the possible options.

(Clark Decl., Ex. 1, at 1.) In response to Breyer's contentions regarding the conduct of SPP faculty, Dr. Clark replied:

> I appreciate that some of the conversations about possible accommodations have been challenging. As you know, the conversations have focused on the essential functions of the program and not individual abilities to be a psychologist. We have all worked to find ways to help you be successful. As you and I have agreed, faculty members have consistently approached these conversations from a supportive stance.
>
> As we discussed previously, you have multiple options that are directly in line with your specific career goals and interests that do not require a PsyD or forensic evaluator training. As we do with other students, we discussed those options during conversations about available paths that could help you meet your personal goals and interests. This information was presented to you because of your particular desire to play an advocacy role for people involved in the legal process.

(*Id.*) In closing, Dr. Clark invited Breyer to contact her if she wished to discuss the issue further.

(*Id.*) Thereafter, Breyer left Pacific.

On January 1, 2017, Breyer filed this lawsuit against Pacific, alleging disability discrimination and retaliation in violation of the ADA and the Rehabilitation Act of 1973, breach of contract, and promissory estoppel. Pacific moves for summary judgment on all claims.

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, unsupported conjecture, or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

To determine whether summary judgment is proper, the court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (emphasis added). The

"mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## Discussion

Pacific moves for summary judgment against each of Breyer's claims, and the Second Amended Complaint in its entirety. (Motion, at 2.) Pacific argues Breyer cannot establish that it discriminated against her in violation of the ADA or Section 504, that it acted with deliberate indifference entitling her to monetary damages under Section 504, or that a contract existed between the parties that was subsequently breached. (*Id.*) Further, Pacific alleges promissory estoppel is not warranted because Breyer cannot establish she reasonably relied on, to her detriment, any promise made by Pacific. (*Id.*) Breyer refutes Pacific's arguments and claims multiple issues of material fact exist to preclude summary judgment in this case. (Pl.'s Mem. In Opp'n to Def.'s Mot. for Summ. J., ECF No. 79 ("Pl.'s Opp'n"), at 20–21.) The court first considers Breyer's claims under the ADA and Section 504, before turning to Breyer's contract claims.

I.     Claims Under the ADA and Section 504

Breyer asserts claims under Title III of the ADA and Section 504 of the Rehabilitation Act (collectively, the "Acts"). Because "there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act," claims brought under both statutes are often analyzed together, and case law construing the Rehabilitation Act is often relied upon to evaluate ADA claims. *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999);

*see also Collings v. Longview Fibre Co.*, 63 F.3d 828 n.3 (9th Cir. 1995), *cert denied*, 516 U.S. 1048 (1996) ("The legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA"). Accordingly, the court examines Breyer's ADA and Section 504 claims jointly, and incorporates judicial interpretation of the Rehabilitation Act when appropriate to evaluate the various rights and obligations implicated under the ADA.

Section 504 of the Rehabilitation Act "seeks to assure evenhanded treatment and the opportunity for [individuals with disabilities] to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate*, 469 U.S. 287, 305 (1985). In general, Section 504 requires that:

> [n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C. § 794(a). "Program or activity," as used in Section 504, explicitly includes "a college, university, or other postsecondary institution[.]" 29 U.S.C. § 794(b)(2)(A). With respect to postsecondary or vocational education services, a person is a qualified individual with a disability if he or she "meets the academic and *technical* standards requisite to admission or participation in the [funding] recipient's education program or activity." 45 C.F.R. § 84.3(1)(3) (emphasis added).

To prevail on a claim under Section 504, a plaintiff must demonstrate (1) she is an individual with a disability; (2) she is otherwise qualified to receive the benefit at issue; (3) she was excluded from or denied the benefits of the program solely on the basis of her disability; and (4) the program receives federal financial assistance. *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).

A plaintiff cannot recover monetary damages under Section 504 unless the defendant engaged in intentional discrimination. *Id.* at 1138. A plaintiff must establish intentional discrimination by demonstrating the defendant acted with deliberate indifference, which requires both "knowledge that a harm to a federally protected right is substantially likely, and a failure to act on that likelihood." *Id.* at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988)). Even if intentional discrimination can be established, punitive damages are not an available remedy under Section 504. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

Congress subsequently enacted the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Title III broadens the reach of the protections enacted by Section 504, and generally provides that:

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). The ADA thus "guarantees [persons with disabilities] more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" *Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (2012). Under Title III, a place of public accommodation includes all "postgraduate private schools, or other places of education." 42 U.S.C. § 12181(7)(J).

To prevail on a claim under Title III of the ADA, a plaintiff must establish (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity which owns, leases, or operates a place of public accommodation; and (3) she was denied public accommodations by the defendant because of her disability. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). Damages are not an available remedy under Title III. *See* 42 U.S.C. § 12188(a)(1) (stating available remedies

for violations of Title III are those set forth by 42 U.S.C. § 2000a-3(a), which permits only civil actions seeking injunctive relief); *see also Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014) ("Damages are not an available remedy to individuals under Title III of the ADA; individuals may receive only injunctive relief").

The parties do not dispute that Breyer is an individual with a disability as defined by the Acts, or that she is otherwise qualified to receive the benefit of the PsyD program. (Motion, at 18 n.5, 27–28; Pl.'s Opp'n, at 20.) Nor do the parties dispute that Pacific is a place of public accommodation, or that it is a private entity which receives federal financial assistance. (*Id.*) Rather, the parties disagree as to whether Breyer was excluded from, denied the benefit of, or otherwise subjected to discrimination by the PsyD program because of her disability, and whether Pacific's actions were deliberately indifferent. (Pl.'s Opp'n, at 20.) Simply put, the instant dispute turns on whether Pacific subjected Breyer to discrimination within the meaning of the ADA and Section 504, and whether such actions were taken with deliberate indifference. (Motion, at 18, 24.)

The term "discrimination" is not directly or consistently defined by the Acts. Title III, for example, contains several "general prohibitions," which constitute discrimination if violated. Such general prohibitions include denying persons with disabilities participation, affording persons with disabilities participation in an unequal benefit, or providing a separate benefit on the basis of disability. 42 U.S.C. §§ 12182(b)(1)(A)(i)–(iii). Title III also sets forth a variety of "specific prohibitions" which constitute discrimination for the purposes of the general rule announced by 42 U.S.C. § 12182(a), including imposing eligibility criteria that disproportionately screens out individuals with disabilities, failing to make reasonable modifications in policies or practices when such modifications are necessary to afford persons with disabilities access to the benefit offered, and

a failure to provide auxiliary aids and services. 42 U.S.C. §§ (b)(2)(A)(i)–(iii). Section 504 prohibits similar conduct. 29 U.S.C. § 794(a); 34 C.F.R. §§ 104.4(b)(1)(i)–(vi).

"Discrimination" under the Acts thus extends beyond "obviously exclusionary conduct — such as a sign stating that persons with disabilities are unwelcome or an obstacle course leading to a store's entrance" — to include "more subtle forms of discrimination . . . that interfere with disabled individuals' 'full and equal enjoyment' of places of public accommodation." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011). That is not to say, however, that "discrimination" is an all-encompassing concept under the Acts. Indeed, the Supreme Court has cautioned that Section 504, and thus Title III, must be interpreted in light of "two powerful but countervailing considerations — the need to give effect to the statutory objectives and the desire to keep [the Acts] within manageable bounds." *Alexander*, 469 U.S. 298–99.

Breyer asserts ten alternative counts of discrimination: (1) denial of equal participation; (2) provision of unequal participation; (3) discrimination in admission and recruitment; (4) unlawful pre-admission inquiries; (5) unlawful eligibility criteria; (6) failure to make reasonable modifications; (7) failure to provide auxiliary aids or services; (8) failure to investigate; (9) disability-based environment of hostility; and (10) retaliation.[15] (SAC ¶¶ 63(a)–(j).) Pacific alleges each count lacks sufficient evidentiary support to establish a legally cognizable claim. (Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 92 ("Def.'s Reply"), at 2.) Accordingly, the court must determine whether an issue of material fact exists with respect to all counts of discrimination alleged.. The court considers the individual counts of discrimination chronologically for clarity.

---

[15] The court numbers the individual counts of discrimination in the order in which they are alleged in the SAC.

### A. Counts 3 and 4: Discrimination in Admission or Recruitment and Unlawful Pre-Admission Inquiries

In general, a qualified person with a disability may not be denied admission to a postsecondary educational institution or otherwise subjected to discrimination in admission and recruitment on the basis of disability. 34 C.F.R. § 104.42(a). In the context of postsecondary admissions, a variety of practices are prohibited, including placing a numerical or proportional cap on the number of individuals with disabilities who may be admitted, utilizing admission tests or criteria that have a disproportionately adverse effect on individuals with disabilities, or engaging in "preadmission inquiry as to whether an applicant for admission is [an individual with a disability]." 34 C.F.R. § 104.42(b)(1), (4).

Breyer acknowledges she was offered and accepted admission to the PsyD program, but contends Pacific discriminated against her during the admissions process in the following ways: (1) Dr. Lane "refused" to rate Breyer's clinical potential during her in-person interview; (2) Pacific required Breyer to submit to an additional interview to discuss her disability; (3) Pacific asked questions unrelated to the essential functions of the PsyD program during her follow-up interview; and (4) Pacific considered her disability in the admissions process after she had confirmed that she could perform all essential functions. (SAC ¶ 63(c), (d); Pl.'s Opp'n, at 32–37.) Pacific responds that none of Breyer's allegations establish a viable claim under the Acts. (Def.'s Reply, at 3–9.)

#### 1. Dr. Lane's Conduct During the In-Person Interview

Breyer alleges Dr. Lane "refus[ed] to complete her in-person interview evaluation based solely on her disability." (Pl.'s Opp'n, at 33.) Specifically, Breyer alleges Dr. Lane rated her clinical potential as "above average" when he reviewed her written application, but subsequently refused to

rate her clinical potential when he interviewed her in-person. (*Id.*) Breyer contends Dr. Lane's refusal to provide a rating was occasioned solely by his observations of her disability, which she argues constitutes discrimination under the Acts. (*Id.*)

Dr. Lane's failure to rate Breyer's clinical potential did not exclude or otherwise hamper her access to the PsyD program — Breyer was unquestionably offered admission to the SPP as a result of the admissions process. Moreover, Breyer's claim that Dr. Lane's willingness to rate her clinical potential on the basis of her written materials evidences his discriminatory motive in declining to rate her clinical potential in person oversimplifies the record. In his deposition testimony, Dr. Lane explained that an applicant's "clinical potential" largely measures his or her "ability to form and maintain relationships and understand others, care about others, et cetera." (Lane Dep. 42:3–7.) Though "the endpoint is the same" insofar as what the clinical potential rating purportedly measures, what informs the rating differs according to the specific context in which it is considered. (Lane Dep. 41:13–19.) In reviewing an applicant's written materials, for example, Dr. Lane testified that he analyzes how the applicant describes personal interactions, whether it appears the applicant has a realistic understanding of what is required in clinical practice, and whether the written work demonstrates an ability to connect with and understand others. (Lane Dep. 41:20–42:7.) In the context of the in-person interview, however, Dr. Lane testified that rating an applicant's clinical potential requires a subjective assessment of various interpersonal characteristics. (*Id.* 50:11–15.) Though Breyer attempts to cast the clinical potential ratings as interchangeable, Dr. Lane arrives at each in different ways — one is gleaned solely from the substance of written materials, and the other is garnered, at least in part, by observing and assessing an individual's presentation.

Dr. Lane testified to his belief that he could not accurately rate Breyer's clinical potential

during the in-person interview "due to the pace and tone of her verbal communication, her eye contact, and her facial expressions." (Lane Dep. 50:2–4; Lane Decl. ¶¶ 6–7.) Contrary to Breyer's assertion that discriminatory animus colored Dr. Lane's "refusal" to rate her clinical potential during the in-person interview, the record reflects Dr. Lane was uncertain as to how to properly evaluate Breyer's clinical potential given the involuntary nature of certain aspects of her presentation. Dr. Lane thus did not simply decline to complete Breyer's in-person evaluation, he subsequently consulted his colleagues to determine, among other things, "how to provide an appropriate and fair rating" under the circumstances. (Lane Decl. ¶ 7.) Breyer identifies no evidence to the contrary, and provides no authority to suggest the Acts prohibit further analysis and discussion among relevant officials to ensure admissions criteria are fairly applied to applicants with disabilities. Accordingly, Dr. Lane's failure to rate Breyer's "clinical potential" during the in-person interview does not amount to discrimination under the Acts.

2.    *Pacific's Request to Discuss the Essential Functions in a Follow-Up Phone Call*

Breyer alleges Pacific discriminated against her by treating her "differently than similarly situated non-disabled applicants when it conducted a follow-up phone interview[.]" (Pl.'s Opp'n, at 33.) Specifically, Breyer contends she is the only student in Pacific's history to be subjected to an additional interview to discuss the essential functions prior to admission, which demonstrates that "[t]he phone interview was really a reason to discuss [Pacific's] assumptions and concerns regarding [her] disability." (*Id.* at 34.) Breyer alleges evidence in the record, specifically an email regarding Breyer's candidacy and Pacific's deviation from its general admissions practices, indicates that the purpose of the March 12 phone call was not to discuss the essential functions, but rather to determine

whether Pacific could afford to accommodate her in the PsyD program. (*Id.*)

These allegations fail for several reasons. First, although Breyer objects that Pacific treated her differently than non-disabled applicants by requesting a follow-up phone call to discuss the essential functions, the Acts do not dictate that persons with disabilities must be provided an experience identical to that of persons without disabilities. *See e.g.*, 42 U.S.C. § 12182(b)(1)(B) (requiring a public accommodation to afford individuals with disabilities its goods, services, or benefits "in the most integrated setting appropriate to the needs of the individual"); 34 C.F.R. § 104.4(b)(2) (noting that an entity's aids, benefits, or services "are not required to produce the identical result or level of achievement for [individuals with disabilities and non-disabled individuals]" to be "equally effective," they simply must provide the same opportunity to benefit or succeed as that provided to individuals without disabilities). The Acts thus do not "compel educational institutions to disregard [an individual's disabilities]." *Davis*, 442 U.S. at 405. Rather, an educational institution must take steps to determine whether an applicant with a disability is otherwise qualified to participate in its programs, that is, whether he or she meets the requisite academic and technical standards for admission. *Id.*; *see also* 45 C.F.R. § 84.3(1)(3) (a qualified individual with a disability is one who "meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity"). Technical standards include all academic and *non-academic* criteria essential to meaningfully participate in a given program, *Davis*, 442 U.S. at 406–07, and admission cannot be denied without determining whether the requisite standards could be met with reasonable accommodation.. *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (quoting *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999)). The Supreme Court has noted that non-academic criteria such as

"legitimate physical qualifications" may be essential to participation in certain programs. *Davis*, 442 U.S. at 407.

Breyer referenced her disability several times throughout her application materials, and Dr. Lane observed the physical manifestations of her disability when he interviewed her on Interview Day. Dr. Lane subsequently developed concerns regarding Breyer's ability to perform certain functions essential to complete the PsyD program, concerns that were shared and discussed with his colleagues. Based on those concerns, Pacific sought additional information via an additional phone conversation to "assess overall [Breyer's] functional ability to complete the program with or without accommodations." (2018 Clark Dep. 58 10–23.) Such conduct in and of itself does not violate the Acts.

Second, the phone call to discuss the essential functions of the PsyD program, though not historically an aspect of Pacific's admissions practices, was not prohibited by any policy or procedure in place at Pacific. (*Id.* 55:6–10; 57:3–59:17.) In fact, Dr. Clark testified that when interactions with an applicant raises questions about whether he or she can perform all essential functions necessary to complete the PsyD program, the steps taken to make that determination "can take whatever form" is helpful under the circumstances. (2018 Clark Dep. 58:1–25.) Breyer points to no evidence to the contrary.

Finally, Breyer's contention that the purpose of the phone call was to determine whether Pacific could financially afford to accommodate her is not supported by the record. Breyer points to an email sent by Dr. Brems to Drs. Ankeny and Barr-Gillespie, alleging it demonstrates Dr. Brems' belief that "Breyer would need accommodation that the university could not provide." (Pl.'s Opp'n, at 34.) Though the email at issue mentioned Dr. Brems's concern that "[they did] not have

the resources within [the] SPP to provide all [of] the accommodations" that might be necessary in Breyer's case, it primarily sought guidance due to uncertainty as to "whether [Breyer could] perform all essential functions listed for the PsyD program." (Stephenson Decl., Ex. N, at 4.) Dr. Barr-Gillespie's response echoes this focus, making no mention of the potential cost of accommodating Breyer, but instead emphasizing the essential functions as a framework for judging the reasonableness of potential accommodations. (*Id.* at 3.) She warned that providing accommodations "outside of [Pacific's] . . . usual and customary approach" could result in "graduating students who cannot fulfill the essential functions of our professions, [which would be] at odds with our stated mission," and concluded that "careful discussion" of Breyer's candidacy was required. (*Id.*) The emails between Dr. Brems and Drs. Ankeny and Barr-Gillespie thus demonstrate that Pacific's concern was whether Breyer could meet the essential functions with reasonable, as opposed to potentially program-altering, accommodations, and not whether it could afford to accommodate her. Accordingly, Breyer has failed to create a question of fact that Pacific discriminated against her in the admissions process by requesting a conversation to discuss the essential functions of the PsyD program.

### 3. The Substance of the March 12, 2015 Phone Call

Breyer also challenges the substance of the March 12 phone call, alleging Pacific discriminated against her by making improper pre-admission inquiries regarding her disability. (Pl.'s Opp'n, at 34–36.) Specifically, Breyer alleges Pacific asked "pointed, specific questions about specific tasks" instead of asking her if she needed accommodations generally, and asked her questions "wholly unrelated to program-related functions." (*Id.* at 36.) Pacific responds that, despite Breyer's allegations to the contrary, the questions asked during the March 12 phone call were not

wholly unrelated to program functions, but even if they were, the questions asked did not result in Breyer's exclusion from the PsyD program. (Def.'s Reply, at 8.)

The Acts prohibit educational institutions from "mak[ing] preadmission inquir[ies] as to whether an applicant for admission is [an individual with a disability]," but allows "inquiries on a confidential basis as to [disabilities] that may require accommodation" once the applicant is admitted. 34 C.F.R. § 104.42(b)(4). The plain language of the controlling regulation thus expressly dictates that an educational institution may not inquire as to an applicant's disability status prior to admission, but leaves ambiguous the question of whether and to what extent inquiry is permitted when such status is known.

Title I of the ADA is instructive in this respect. For example, Title I similarly prohibits pre-employment inquiry as to an applicant's disability status, as well as inquiry concerning the nature and severity of an applicant's disability. 29 C.F.R. § 1630.13(a). Title I expressly permits, however, inquiry as to "the ability of an applicant to perform job-related functions," and allows regulated entities to "ask an applicant to describe or demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions." 29 C.F.R. § 1630.14(a); See also Harris v. Harris & Hart, Inc., 206 F.3d 838, 842, (9th Cir. 2000) (noting pre-employment inquiries are appropriate "when an employer could reasonably believe that an applicant's known disability will interfere with the performance of a job-related function"). Inquiry as to possible accommodations to facilitate the performance of such functions therefore is also permitted.

Though such inquiries are not explicitly permitted by Section 504 or Title III, they are similar in scope and substance to the types of inquiries necessary to determine whether an applicant with a

disability is otherwise qualified to participate in or benefit from an educational institution's programs — that is, whether he or she meets all academic and technical criteria for admission. Thus, it is reasonable to conclude that 34 C.F.R. § 104.42(b)(4) does not prohibit inquiry as to an applicant's ability to perform program-related functions when an educational institution has reason to believe a known disability may impede the performance of such functions, and that educational institutions are permitted to ask an applicant questions as to how he or she will perform program-related functions and what accommodations might be necessary to do so. The parties agree such inquiries are permitted under the Acts.

Breyer's allegations that Pacific unlawfully inquired about her disability before she was offered admission to the SPP fails for two reasons. First, Breyer revealed her status as an individual with a disability in her written application materials. She also requested an accommodation for Interview Day, where SPP faculty observed her obvious speech and motor impairments. Having witnessed the extent of Breyer's physical impairments, the record shows that SPP faculty reasonably believed Breyer's disability might interfere with program-related functions, particularly communicating with clients and administering clinical assessment tests. Pacific thus did not violate the Acts by asking questions about her ability to perform such functions and how she would perform such functions, with or without accommodations.

Second, though Breyer insists that certain questions during the March 12 phone call, such as "how children and adults react to her, if she can arrange blocks, whether she had ever used a personal aid to assist with her disability, and whether she had been evaluated by a doctor" violate the Acts, those questions did not seek to uncover the nature or severity of Breyer's disability, nor did Breyer's answers reveal any specific details of her disability status. Rather, the challenged questions

concerned either Breyer's ability to perform program-related functions — arranging blocks, for example, which is required to administer a specific subtest in the Cognitive Assessment course, and clear communication with clients, which may involve children or adults — or how she might perform program-related functions — that is, whether she needed accommodation to perform certain tasks, whether she had been evaluated by a doctor to determine what kind of accommodations might be necessary, or whether she had utilized a specific accommodation in the past. Breyer was not excluded from or denied the benefit of the PsyD program, she was offered admission.

4.    *Consideration of Breyer's Disability in the Admission Decision*

Breyer alleges Pacific discriminated against her in the admissions process by considering her disability in determining whether to offer her admission to the SPP. (Pl.'s Opp'n, at 37.) Specifically, Breyer points to emails sent between members of the admissions committee following the March 12 phone call, arguing that their discussion "of whether Breyer would be able to 'meet the challenges of our graduate program,' her speech impairment, her 'communication with clients,' and their comments that 'it would be hard for us to assume we could predict success/failure in this case than in others,' and that 'takes the chance as any other student,' is evidence that "the SPP was not concerned with whether [she] could perform the essential functions of its program . . . but rather with its own conjectures regarding Breyer's abilities and whether it believe she could (or could not) ultimately succeed as a student in light of her disability." (*Id.*)

Though "mere possession of a [disability] is not a permissible ground for assuming [a prospective student's] inability to function in a particular context," *Davis,* 442 U.S. at 405, Breyer's allegations misrepresent and otherwise mischaracterize the record. Breyer selectively quotes from a string of emails summarizing the March 12 phone call, arguing the resulting collection of isolated

phrases demonstrates Pacific's improper reliance on its own assumptions about Breyer's abilities to determine whether to admit her to the SPP. But the emails in question, when read fully and in context, reveal the opposite. In fact, the admissions committee's conclusion that "all students are taking a chance that they will be able to meet the challenges of [the PsyD] progam, and as long as [Breyer] signs the Essential Functions, it would be hard [to] assume . . . success/failure [could be predicted] better in [her] case than in others," (Stephenson Decl., Ex. K, at 78–79), indicates that Breyer's disability was not a factor that held any weight once it was determined that she met all of the technical requirements of the PsyD program. But even if Pacific had relied on particular assumptions about Breyer's abilities to determine whether or not she should be admitted to the SPP, such reliance resulted in an offer of admission rather than a denial. Thus, Breyer was not excluded or otherwise denied the benefit of the PsyD program by Pacific's consideration of her disability in the admissions process.

### 5. *Summary*

For the reasons detailed above, Pacific did not discriminate against Breyer during the admissions process by refusing to rate her clinical potential during the in-person interview, by requesting a follow-up conversation to discuss the essential functions, by improperly inquiring about her disability, or by improperly considering her disability in determining whether to offer her admission to the SPP, and Breyer ultimately was not excluded or otherwise denied the benefit of the PsyD program. Accordingly, no issues of material fact exist with respect to Counts 3 and 4.

### B. *Counts 1 and 2: Denial of Equal Participation and Provision of Unequal Participation*

Discrimination under Title III includes denying, on the basis of disability, "the opportunity

. . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," and "afford[ing] an individual . . . on the basis of disability . . . [an] opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. §§ 12182(b)(1)(A)(i), (ii). Section 504 similarly prohibits such conduct. *See* 29 U.S.C. § 794(a) (recipient of federal funds prohibited from "exclud[ing] [an individual with disabilities] from . . . participation in" or "den[ying] [an individual with disabilities] the benefits of" a program or activity solely on the basis of disability); 45 C.F.R. § 84.4(b)(ii) (when providing any aid, benefit , or service, prohibited discriminatory actions by recipient of federal funds include "[a]ffording a qualified [person with a disability] the opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others"). The Acts thus require regulated entities to provide individuals with disabilities "meaningful access" to their programs, services, or benefits. *See Bird v. Lewis & Clark College*, 303 F.3d 1015, 1020 (2002) (noting regulated entities must take affirmative steps to provide individuals with disabilities meaningful access to its programs); *see also Kalani v. Starbucks Corp.*, 117 F. Supp. 3d 1078, 1087 (N.D. Cal 2015) (regulated entities cannot afford individuals with disabilities an experience that is not "functionally equivalent" to that provided to individuals without disabilities). "[T]he central inquiry is whether the program, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Bird*, 303 F.3d at 1021 (internal quotations and citations omitted).

Pacific moves for summary judgment on Counts 1 and 2, alleging Breyer cannot establish she was denied the full and equal enjoyment of the PsyD program. (Motion, at 19.) In response, Breyer alleges Pacific denied her participation or provided her with an opportunity to participate in

an unequal benefit by (1) taking various actions during the admissions process based on assumptions about her disability; (2) failing to follow-up with Dr. Cobble-Temple to determine how to best provide her with access to education after she was admitted to the SPP; (3) focusing on her limitations; and (4) failing to investigate and remedy her complaints of discrimination. (Pl.'s Opp'n, at 21–30.) Pacific refutes Breyer's arguments, and contends, among other things, that Breyer was never denied meaningful access to the PsyD program. (Def.'s Reply, at 17–21.)

*1. Pacific's Conduct During the Admissions Process*

Breyer alleges Pacific denied her equal opportunity to participate in or benefit from the PsyD program by deviating from its admissions procedures and treating her differently from applicants without disabilities. (Pl.'s Opp'n, at 25–26.) Specifically, Breyer contends that faculty and staff of the SPP engaged in "panicked meetings and emails" to discuss her application after becoming aware of her disability, that she was the only student in the SPP's history to be subjected to a pre-admission phone call to discuss the essential functions, and that Pacific considered her disability when it decided to offer her admission to the PsyD program. (*Id.* at 25–26.) Pacific's actions during the admissions process, Breyer argues, were "based only on its own conjectures about [her] abilities, in light of her disability." (*Id.* at 26.)

As discussed *supra*, Breyer was not denied participation in the PsyD program as a result of Pacific's conduct during the admissions process. Pacific's deviation from its general admissions practices, discussions regarding Breyer's application, and consideration of her disability in its deliberations did not exclude or otherwise deny Breyer the opportunity to benefit from the PsyD program. Though Breyer finds Pacific's conduct during the admissions process objectionable, such conduct did not impede her ability to pursue or obtain a PsyD degree. Indeed, the challenged

conduct ultimately resulted in Breyer's admission to the SPP as a student in the PsyD program.

Nor did Pacific's conduct during the admissions process afford Breyer an unequal opportunity to participate in the PsyD program. First, whether the deliberations of the admissions committee consisted of "panicked emails and meetings" is of no consequence because those deliberations resulted in Breyer's admission to Pacific.

Second, though Breyer appears to argue that any deviation from regular admissions practices violates the Acts, as explained above, educational institutions are not required to ignore an individual's disabilities. *Davis*, 442 U.S. at 405. Rather, the Acts permit institutions such as Pacific to investigate further if there are questions whether an applicant meets all academic and technical requirements for admission. *Id.* The record demonstrates that Pacific sought additional information from Breyer via a follow-up phone conversation, and thereafter provided her with the essential functions document to confirm she met all technical requirements of the PsyD program. The Acts do not prohibit such conduct, and even if they did, a single pre-admission phone conversation and the early provision of a single document does not render the opportunity to participate in the PsyD program afforded to Breyer unequal as a whole.

Finally, whether Pacific considered Breyer's disability in the admissions process is of no consequence, because the decision made was to *include* her in the PsyD program, not to exclude her. Thus, such conduct did not deny Breyer's participation in the PsyD program or afford her an unequal opportunity to participate in the PsyD program compared to her peers.

In sum, the evidence is insufficient to suggest that the admission committee's deliberations, request that Breyer participate in a pre-admission phone call to discuss the essential functions, or consideration of Breyer's disability during the admissions process resulted in Breyer's exclusion

from the PsyD program or somehow afforded her an unequal opportunity to participate in the PsyD program. Rather, Breyer was offered, and accepted, the same opportunity to earn a PsyD degree as that offered to applicants without disabilities, and the challenged conduct ultimately had no bearing on her access to the PsyD program as a whole. Accordingly, Breyer fails to establish Pacific discriminated against her during the admissions process by denying her participation in the PsyD program, or by affording her an opportunity to participate in the PsyD program that was not functionally equivalent to that provided to students without disabilities.

### 2. Pacific's Failure to Follow-Up With Dr. Cobble-Temple

Breyer alleges that after her admission to the SPP, Pacific received general information from Dr. Cobble-Temple that "should have put [Pacific's] fears to rest." (Pl.'s Opp'n, at 27.) Though Dr. Cobble-Temple made herself available as a resource, there was no additional communication from Pacific. Breyer alleges that Pacific should have followed-up with Dr. Cobble-Temple to investigate "how to provide [her] with access to education," that its failure to do so constitutes discrimination, and that "[Pacific's] failure to educate itself simply demonstrates that it was not interested in ensuring [her] the same access to education it provided to non-disabled students." (*Id.*)

Although an educational institution is required to take affirmative steps to provide individuals with disabilities meaningful access to its programs under the Acts, there is nothing to suggest similar steps must be taken to investigate how to "provide access to education" in the abstract, much less that those steps must include the specific action Breyer demands here. Indeed, such a requirement would stand contrary to the entity's duty to conduct a fact-specific inquiry to determine appropriate accommodations in light of individual circumstances, effectively excluding the individual seeking access from the conversation. Dr. Cobble-Temple's own declaration acknowledges that

PAGE 55 - OPINION AND ORDER

individualized analysis is necessary, explaining that educational institutions seeking to provide "equal access" to its programs must "work in conjunction with students" to determine "the most effective accommodation strategies to meet the essential functions," an inquiry her own PsyD program engages in "on a case-by-case basis." (Cobble-Temple Decl. ¶ 20.)

Pacific took proactive steps, months in advance and of its own accord, to start gathering general information about the types of modification and support that might be necessary to accommodate Breyer during her tenure as a student. (*See* Arnaut Dep. 123:22–124:2 (noting she contacted Dr. Cobble-Temple after Breyer's admission to the PsyD program "to proactively think about what we could do to help her be successful").) The Acts do not require Pacific to continue those efforts to a stopping point of Breyer's choosing. More importantly, Breyer does not explain, and the court cannot surmise, how Pacific's failure to "follow-up" with Dr. Cobble-Temple resulted in Breyer being denied participation in the PsyD program, or how such failure resulted in the provision of an unequal opportunity to participate in the PsyD program as a whole. Pacific's failure to further correspond with Dr. Cobble-Temple following Breyer's admission thus does not amount to discrimination under the Acts.

### 3. *Pacific's Focus on Breyer's Limitations*

Breyer alleges Pacific focused on unwarranted assumptions about her limitations, resulting in her unequal participation in the PsyD program. (Pl.'s Opp'n, at 27–30.) Breyer points to various meetings she attended with SPP faculty, insisting that whose discussions unnecessarily focused on the internship requirement and clinical assessment testing, neither of which was imminent. (*Id.*) Specifically, Breyer alleges that (1) SPP faculty had a meeting to discuss Breyer's admission to the program in which Dr. Brems's "focus was on communicating to Breyer that she would not be able

to obtain the internships she proposed;" (2) Dr. Li questioned whether Breyer had chosen the right career path; and stated she could not recommend Breyer to practicum sites because she was unsure if Breyer could do the work; and (3) Pacific continuously made "unsolicited, unwanted, and unneeded offers of 'advance planning,' which she alleges "are *evidence of discrimination*." (*Id.* at 28–30 (emphasis in original).) Pacific responds that Breyer's allegations misstate the factual record or otherwise fail to demonstrate she was denied meaningful access to the PsyD program as a whole. (Def.'s Reply, at 19.)

As previously explained, Breyer was not denied participation in the PsyD program. She was admitted to and attended Pacific as a student in the PsyD program until she withdrew in October 2015. Nor did Pacific's alleged focus on her limitations result in Breyer's unequal participation in the PsyD program as a whole.

At the outset, the court notes that Breyer's claim concerning Dr. Brems mischaracterizes the record. Though Dr. Brems admitted in her deposition testimony that a meeting was held between SPP faculty and that she wished to discuss the internship requirement, Dr. Brems's concern arose from Breyer's email to Dr. Elder announcing that she had identified three potential internship sites. (Brems Dep. 56:8–24.) Because students must secure internships through the online national match process, Dr. Brems's focus was on correcting Breyer's demonstrated misunderstanding as to the mandatory procedure for student placement, a focus wholly unrelated to her disability.

Breyer's allegations concerning Dr. Li must also fail to find support in the record. Dr. Li's comments were made during the course of a single meeting. There is no evidence Breyer worked with or even came into contact with Dr. Li at any other time during her tenure as a student in the PsyD program, nor is there evidence that Breyer asked for, but was denied, a recommendation from

Dr. Li for a practicum site. Though Breyer may have taken offense, two statements made within the context of a single meeting did not interfere with Breyer's access to the PsyD program or render her experience in the PsyD program unequal as a whole.

Lastly, Breyer's allegations that Pacific discriminated against her by attempting to plan accommodations in advance directly contradict her allegations concerning Pacific's failure to investigate as set forth in Count 6, discussed *infra*. Breyer insists Pacific's attempts to discuss and plan appropriate accommodations for the Cognitive Assessment course constitute discrimination because those efforts were undertaken too early, but she simultaneously claims that Pacific's investigation of the same potential accommodations was initiated too late, and thus also constitute discrimination. The result Breyer suggests, that Pacific is in violation of the Acts both by attempting to investigate and plan appropriate accommodations in advance and by waiting until an accommodation is requested, is unreasonable.

Nevertheless, the record indicates that the question of whether Breyer needed accommodation for clinical assessment testing was discussed in only three of the six meetings Breyer had with SPP faculty: the meeting with Drs. Arnaut and Li on October 12, 2015, held in response to Breyer's comment that Pacific had not been supportive of her needs, (Li Dep. 80:10–20); the meeting Breyer requested with Drs. Arnaut and Clark on October 19, 2015, to discuss the remaining program requirements, (Richman Decl., Ex. 1, at 98–99); and the final meeting with Dr. Clark on October 26, 2015, in which Breyer withdrew from Pacific. That potential accommodations were discussed at three meetings — two of which occurred after Breyer affirmatively stated that she might need accommodations for the Cognitive Assessment course — is not enough to deny Breyer equal access to the PsyD program as a whole. Pacific's conduct thus does not amount to discrimination under the

Acts.

### 4.    Pacific's Handling of Breyer's Complaints

Breyer alleges Pacific blatantly ignored her complaints about her treatment during the admissions process, as well as her treatment by Dr. Tram. (Pl.'s Opp'n, at 28–29.) Though she first complained in May about the March 12 phone call, Breyer alleges Pacific subsequently took no action to address her complaints. (*Id.*) Breyer also claims her complaints about Dr. Tram were "met with skepticism and an assumption Breyer was wrong." (*Id.* at 29.)

But the record shows Pacific addressed Breyer's concerns as they arose: Dr. Elder agreed to meet with Breyer once she moved to Oregon to discuss "the way the university handled issues of diversity" during the March 12 phone call, (Elder Dep. 171:9–172:18); Dr. Elder, Dr. Tasker, and Dr. Brems met with Breyer, at her request, to discuss her concerns soon after classes commenced, (2017 Breyer Dep. 111:19–112:3, 112:22–113:10); Dr. Tram's conduct was discussed in more than one meeting in which Breyer declined assistance in remedying the situation (2018 Breyer Dep. 145:2–146:3, 170:3–12, 217:11–14); Dr. Clark nevertheless addressed the issue with Dr. Tram privately and shared Breyer's concerns with Dr. Tasker, the Academic Director (2017 Clark Dep. 22:1–24:2); and Breyer was provided with information detailing the steps to initiate a formal investigation into her complaints, though she never followed through with those steps (July Richman Decl., Ex. 1, at 81; 2018 Breyer Dep. 219:25–220:12). Breyer's allegations concerning Pacific's "deflection" of her complaints thus find no basis in the record before the court.

Furthermore, there is no evidence that Pacific's handling of Breyer's complaints impeded her access to the PsyD program as a whole. Pacific's handling of Breyer's complaints thus did not deny her participation in the PsyD program and did not result in her unequal participation in the PsyD

program.

### 5.    Summary

For the reasons set forth above, Breyer has failed to demonstrate that she was excluded from the PsyD program or otherwise afforded an opportunity to participate in the PsyD program that was unequal to that afforded to students without disabilities due to Pacific's conduct during the admissions process, its failure to follow-up with Dr. Cobble-Temple, its focus on her limitations, or its deflection of her complaints. Accordingly, no issue of material fact exists with respect to Counts 1 and 2.

### C.    Count 5: Use of Unlawful Eligibility Criteria

Under Title III, discrimination includes "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations[.]" 42 U.S.C. § 12182(2)(A)(I); 28 C.F.R. § 36.301(a). Utilizing such criteria is similarly proscribed under Section 504. *See* 34 C.F.R. § 104.4(b)(4) (recipient of federal funds may not "utilize criteria . . . that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to [individuals with disabilities]"). However, eligibility criteria shown to be "necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered" are not discriminatory, even if such criteria tends to screen out individuals with disabilities. 42 U.S.C. § 12182(2)(A)(I).

In the context of education, the Ninth Circuit has instructed that a healthy measure of deference must be extended to an educational institution's academic decisions, including what

requirements are "necessary" to ensure fulfillment of program objectives, so long as the institution's academic judgment is not disguising "truly discriminatory requirements." *Zukle*, 166 F.3d at 1047–48. The educational institution bears the burden of providing a sufficiently developed record to demonstrate that it "conscientiously considered all pertinent and appropriate information in making its decision." *Wong*, 192 F.3d at 823. Once that burden is met, the court must defer to the educational institution's academic judgment. *Zukle*, 166 F.3d at 1048.

Breyer contends that requiring students to physically administer clinical assessment tests "would have the disproportionate effect of excluding individuals with disabilities, like [her]," and "would tend to create a direct bar to individuals with motor impairments." (Pl.'s Opp'n, at 39–40 (emphasis in original).) She further argues such a requirement is not a necessary component of the PsyD program because it strays from industry standards and practices typical of other PsyD programs. (*Id.* at 40.) Accordingly, Breyer alleges Pacific's academic judgment in this regard is not entitled to deference. (*Id.* at 40.) Pacific responds that Breyer offers no evidence that she, or any other person with a disability, was screened out or excluded from the PsyD program by the Cognitive Assessment course requirements. (Def.'s Reply, at 15.) Further, Pacific argues Breyer has failed to overcome the deference due to its academic judgment, because whether students must independently conduct clinical assessments is an unsettled question in the psychological community. (*Id.* at 15–16.)

Breyer's allegations that Pacific utilized unlawful eligibility criteria suffer from two fatal flaws. First, as Pacific points out, Breyer has provided no evidence that she, or any other individual with a disability, was screened out or otherwise excluded from the PsyD program due to a requirement that students must physically administer clinical assessment tests as part of the PsyD

curriculum. Indeed, Breyer withdrew before enrolling in the Cognitive Assessment course, the earliest instance where the test administration requirement would have been applicable. Moreover, Breyer alleges she "is not the first student in the SPP with a physical disability," (Pl.'s Opp'n, at 38), but she does not allege that any other students with physical disabilities who attended the SPP were screened out or adversely impacted by the test administration requirement. Thus, even if the test administration requirement appears on its face to screen out individuals with motor impairments, the evidence before the court indicates it has not effectively done so in practice.

Second, Breyer argues the test administration requirement is not a necessary component of the PsyD program because it represents "a substantial departure from APA guidelines, industry standards, and the practices of other similar PsyD programs," but she neglects to acknowledge that Pacific was in the process of making that determination when she withdrew. (*See* Stephenson Decl., Ex. K, at 91 (action plan to include "discussion with faculty about SPP's view on allowable testing accommodations (e.g., does student have to administer all subtests herself?")); Clark Decl. ¶¶ 18, 19 (explaining that "it was important for the PsyD program to consider whether it was essential to the learning objectives of the [Cognitive Assessment course] for students to actually administer all subtests").) Pacific was obligated to conscientiously consider all pertinent and appropriate information in determining whether standardized administration of clinical assessment tests is a necessary component of student training to the fulfill the academic objectives of the PsyD program, and it does not violate the Acts by doing so.

Thus, for the reasons enumerated above, Pacific did not utilize unlawful eligibility criteria that excluded, or had the tendency to exclude, Breyer or any other individuals with disabilities from the PsyD program. Accordingly, no issue of material fact exists with respect to Count 5.

D.    *Counts 6, 7, and 8: Failure to Investigate Reasonable Accommodations, Failure to Make Reasonable Modifications, and Failure to Provide Auxiliary Aids*

To facilitate meaningful access to its programs, educational institutions have a "mandatory obligation . . . to engage in an informal interactive process 'to clarify what [an] individual [with disabilities] needs and [to] identify the appropriate accommodation.'" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391 (2002)); *see also Wong*, 192 F.3d at 818 (quoting *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993)) (the Acts create "a duty to 'gather sufficient information from the [individual with a disability] and qualified experts as needed to determine what accommodations are *necessary* to enable [the individual to meet the standards in question]"). The interactive process "is triggered upon notification of the disability and the desire for accommodation." *Vinson*, 288 F.3d at 1154 (citing *Barnett*, 228 F.3d at 1114). The Acts do not require regulated entities "to make any and all possible accommodations that would provide full and equal access to disabled patrons; they need only make accommodations that are reasonable." *Baughman* , 685 F.3d at 1135.

To accommodate an individual with a disability, an educational institution may be "required to make reasonable, but not fundamental or substantial, modifications to its programs." *Bird*, 303 F.3d at 1020 (citing *Alexander*, 469 U.S. at 300); *see also* 42 U.S.C. § 12182(b)(2)(A)(ii) ("discrimination" includes failing to make reasonable modifications . . . when such modifications are necessary to afford . . . goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities); 34 C.F.R. § 104.44(a) (academic institutions must "make such modifications to its academic requirements as are necessary to ensure that such requirements do not

discriminate or have the effect of discriminating, on the basis of [disability], against a qualified . . . applicant or student [with a disability]"); *Davis*, 442 U.S. at 413 (school was not obligated to substantially modify its programs or lower its standards to accommodate students with disabilities).

Educational institutions must also "take such steps as are necessary to ensure that no [student with a disability] is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination *because of* the absence of educational auxiliary aids." 34 C.F.R. § 104.44(d) (emphasis added); *see also* 28 C.F.R. § 36.303(a) (public accommodations must take steps to ensure individuals with disabilities are not "excluded, denied services, segregated, or otherwise treated differently because of the absence of auxiliary aids and services"). Such auxiliary aids may include notetakers, accessible electronic and information technology, or other devices and services necessary to aid students with sensory, manual, or vocal disabilities. 28 C.F.R. §§ 36.303(b)(1)–(4). Aids or services of a personal nature or for personal use need not be provided. 34 C.F.R. § 104.44(d)(2) (recipients of federal funds "need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature"); 28 C.F.R. § 36.306 (public accommodations are not required to "provide its customers, clients, or participants with personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; or services of a personal nature including assistance in eating, toileting, or dressing"). Further, specific aids and services need not be provided if doing so would fundamentally alter the nature of the service or privilege offered, or if doing so would inflict an undue burden. 28 C.F.R. § 36.303(a) (public accommodation need not take steps to provide auxiliary aids and services if it "can demonstrate that taking those steps would fundamentally alter

the nature of the . . . services . . . being offered or would result in an undue burden, i.e., significant difficulty or expense").

Pacific moves for summary judgment on Counts 6, 7, and 8, arguing Breyer was never denied a modification or auxiliary aid because she withdrew from Pacific during the interactive process before accommodation was needed. (Motion, at 23–25.) Breyer refutes Pacific's argument, alleging Pacific should have taken preemptive steps to investigate how to accommodate students with disabilities in the Cognitive Assessment course. (Pl.'s Opp'n, at 38.) Specifically, Breyer argues Pacific waited too long to engage in the interactive process, failed to utilize information available to it through Dr. Cobble-Temple, the American Psychological Association, and its own faculty, and failed to provide her an assistant for classroom use. (*Id.* at 38, 41–42.)

The court notes that Breyer's response focuses only on Pacific's alleged failure to investigate and Pacific's alleged failure to provide her with an assistant, otherwise neglecting to identify any modifications Pacific failed to make to its policies, practices, or procedures. Though Breyer did not address the failure to modify claim in her Response, the court can infer that claim seeks to challenge Pacific's failure to modify the Cognitive Assessment course requirements. Even assuming that to be the case, Breyer withdrew from Pacific when the Cognitive Assessment course was still months away. Furthermore, the record demonstrates that Breyer was afforded every accommodation she requested to facilitate her participation in her first semester classes, and she does not allege any policy, practice, or procedure stood in her way. (July Richman Decl., Ex. 3, at 24–25.) Pacific thus did not discriminate against Breyer by failing to modify a policy, practice, or procedure necessary to afford Breyer meaningful access to the PsyD program.

Breyer's failure to investigate claim fares no better. Though Breyer alleges Pacific

wrongfully delayed its engagement in the interactive process to determine how to accommodate her until nearly seven months after she was admitted to the PsyD program, Pacific's duty to engage in the interactive process is triggered when it has knowledge of a student's disability *and* accommodation is desired. *Vinson*, 288 F.3d at 1154. The record shows that Breyer stated that she might need an accommodation for the second semester Cognitive Assessment course when she met with Drs. Clark and Arnaut on October 19, 2015. (2018 Breyer Dep. 230:13–22.) In response, Drs. Clark and Arnaut created an action plan that outlined the various tasks to be completed to determine appropriate accommodations for Breyer, including providing Breyer with videos of assessment testing to demonstrate what is required, researching the policies of other schools with respect to accommodating standardized assessment testing, gathering information about the accommodations that have been utilized for other students in the past, and consulting faculty about what accommodations would be allowable in the context of assessment testing. Thus, by the time Breyer affirmatively requested an assistant on October 24, 2015, Pacific already had initiated the interactive process and was actively fulfilling its duty to investigate. The Acts do not otherwise require Pacific to unilaterally "take preemptive steps to investigate" months in advance, as Breyer suggests. (Pl.'s Opp'n, at 38.)

Breyer also challenges Pacific's failure to "consult . . . every resource available to it" to determine how to best accommodate her in the Cognitive Assessment course. (*Id.*) Breyer again takes issue with Pacific's failure to follow-up with Dr. Cobble-Temple, and complains that Pacific did not utilize information available through the APA or the collective knowledge of its own faculty to determine appropriate accommodations. (*Id.*) But Breyer's insistence that Pacific had a duty to consult every existing resource available to it is misplaced. The cornerstone of an entity's duty to

PAGE 66 - OPINION AND ORDER

investigate under the Acts is its obligation to consult the individual in need of accommodation. *See Wong*, 192 F.3d at 818 (noting the Acts create a duty to consult the individual with a disability to determine appropriate accommodations); *Bird*, 303 F.3d at 1020 (explaining that educational institutions must engage in a "fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him [or her] to meet the program's standards") Beyond working directly with the individual, the Ninth Circuit has noted that educational institutions must only consult "qualified experts as needed" to determine what accommodations are necessary to facilitate the meaningful participation of an individual with a disability. *Wong*, 192 F.3d at 818. Here, Drs. Clark and Arnaut consulted Breyer and developed an action plan, which included providing Breyer with additional information to better understand what she may need, exploring industry practices and the policies of other schools, and utilizing the experience and expertise of SPP faculty. There is nothing to suggest that these efforts would have been insufficient to determine what accommodations would have been necessary under the circumstances, and Pacific is not required to expand the substance and scope of its investigation otherwise.

Finally, Breyer's claim that Pacific discriminated against her by failing to provide her necessary auxiliary aids and services holds little weight. Breyer has provided no evidence that she was denied the benefits of, excluded from participation in, or otherwise subjected to discrimination in the PsyD program *because of* the absence of auxiliary aids or services, much less because she lacked the services of an assistant. Indeed, Breyer withdrew from Pacific before such services may have been needed to facilitate her participation in the Cognitive Assessment course. Moreover, educational institutions are required to provide only accommodations that are *necessary* to enable

an individual with disabilities to meet the standards of the program in question. *Wong*, 192 F.3d at 818. Breyer maintains she would not have needed any form of accommodation to complete the Cognitive Assessment course, and therefore, an auxiliary aid or service was not necessary for her to meet the standards of the PsyD program. (Breyer Decl. ¶ 11.)

Breyer has provided no evidence that Pacific failed to investigate reasonable accommodations; failed to modify its policies, practices, and procedures; or failed to provide her with necessary auxiliary aids or services. Further, there is no evidence that such failures denied her the benefit of, excluded her participation in, or otherwise subjected her to discrimination in the PsyD program. In fact, Pacific did not fail to reasonably accommodate Breyer because she withdrew from the PsyD program before accommodations would have been necessary, assuming Breyer would have needed accommodations at all. Pacific properly engaged in the interactive process when Breyer indicated she might need accommodation for a class months in the future, and that process was ongoing when she decided to withdraw from the PsyD program. Accordingly, no issues of material fact exist as to Counts 6, 7, and 8.

F    *Count 9: Hostile Educational Environment*

Breyer alleges Pacific discriminated against her in violation of the Acts by "maintaining a disability-based environment of hostility." (SAC ¶¶ 63(I); 68.) The Ninth Circuit has yet to determine whether hostile learning environment claims are cognizable under the Acts, and the issue has had little traction in the district courts. *See Garedakis v. Brentwood Union Sch. Dist.*, 756 Fed. App'x 669, 671 (9th Cir. 2018) ("Assuming without deciding that the [hostile educational environment] theory is cognizable in our circuit, that claim fails because the plaintiffs have not shown the alleged abuse was 'by reason of' or 'solely by reason of' their disabilities"); *see also*

*Wormuth v. Lammersville Union Sch. Dist.*, 305 F. Supp. 3d 1108, 1127 n.5 (E.D. Cal. 2018) (declining to recognize a claim for hostile learning environment under the Acts in the absence of supporting authority within the Ninth Circuit). Breyer urges the court to recognize her hostile learning environment claim, but offers little more than a case summary of *Guckenberger v. Boston University*, 957 F. Supp. 306 (D. Mass. 1997), to support her request.

In *Guckenberger*, a group of students brought suit against Boston University, alleging, among other things, that the University's president denied necessary accommodations for multiple learning-disabled students and made derogatory comments about students with learning disabilities in letters (later published by major news outlets) and in public speeches. *Id.* at 312. Such conduct, the students argued, created a hostile learning environment for students with learning disabilities in violation of the Acts. *Id.* at 313. Noting only one federal court appeared to have recognized such a claim, the district court reviewed the statutory language of Title III and Section 504, and found it to be "substantially similar" to that of Title IX of the Education Amendments of 1972, which provided the statutory basis for hostile educational environment claims arising from episodes of sexual harassment. *Id.* The district court, finding "cases interpreting the analogous language and policies of Title VII and Title IX" persuasive, determined a cause of action existed under the Acts "when harassment based on a student's disability has 'the purpose or effect of unreasonably interfering with [the] individual's performance or [of] creating an intimidating, hostile, or offense environment." *Id.* at 314. The district court reasoned that its conclusion was "consistent with the express congressional purpose in enacting the ADA to 'address the major areas of discrimination faced day-to-day by people with disabilities.'" *Id.* (quoting 42 U.S.C. § 12101(b) (ADA congressional statement of findings and purposes)).

Despite the *Guckenberger* court's reasoned analysis, few courts since then appear to have adopted a similar position. *See, e.g.*, *Toma v. Univ. of Hawaii*, 304 F. Supp. 3d 956, 965–66 (D. Haw. 2018) (noting the *Guckenberger* court "conducted a thoughtful statutory analysis," but that its decision "appears to be an outlier"); *Sutherlin v. Ind. Sch. Dist. No. 40 of Nowata Cty, Okla.*, 960 F. Supp. 2d 1254, 1267 (N.D. Okla. 2013) (declining to recognize a hostile learning environment claim where *Guckenberger* was the only authority cited by the plaintiff); *Junhe Qui v. Univ. of Cincinnati*, Case No. 1:18-cv-634, 2019 WL 2396664, at *5 (S.D. Ohio June 6, 2019) (noting that no federal cases in the Sixth Circuit recognize a hostile learning environment claim, but determining, *arguendo*, that plaintiff failed to plausibly suggest he was subjected to a hostile learning environment); *Barry as next friend of A.P. v. Cedar Rapids Cmty. Sch. Dist.*, No. C17-120-LTS, 2019 WL 1234330, at *15 n.9 (N.D. Iowa Mar. 15, 2019) (citing *M.P. es rel. K. and D.P. v. Ind. Sch. Dist. No. 721*, 439 F.3d 865, 868 (8th Cir. 2006) (finding the Eighth Circuit neither endorses nor forcloses hostile learning environment claims under Section 504); *but see Lawton v. Success Acad. Charter Sch., Inc.*, 323 F. Supp. 3d 353, 367 (E.D.N.Y. 2018) (agreeing "a hostile learning environment is just as invidious as a hostile work environment," but finding the complaint "devoid of the sharply-pointed, crudely-crafted, and frequently-launched slings and arrows that courts have found sufficient to establish severe and pervasive harassment"). In the Ninth Circuit, only one district court has suggested a willingness to adopt the reasoning of *Guckenberger*. *See Ticer v. Young*, No. 16–cv 02198–KAW, 2016 WL 4719272, at *7 (N.D. Cal. Sept. 9, 2016) (finding the *Guckenberger* holding "persuasive," but determining the challenged conduct occurred outside of the statute of limitations). Because there is little authority within as well as outside the Ninth Circuit to support the recognition of a hostile learning environment claim under the Acts, the court declines

to recognize such a claim here.

Even assuming, *arguendo*, that a hostile learning environment claim is cognizable, Breyer's claim fails. To evaluate the merits of a hostile learning environment claim, the *Guckenberger* court adopted the "flexible Title VII standards for establishing a hostile work environment claim[.]" *Guckenberger*, 957 F. Supp. at 314 (citing *Brown v. Hot, Sexy and Safer Prod., Inc.*, 68 F.3d 525, 540 (1st Cir. 1995)). Under the Title VII framework, Breyer must demonstrate: "(1) that she is a member of a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment is sufficiently severe or pervasive that it alters the conditions of her education and creates an abusive educational environment, and (5) that there is a basis for institutional liability." *Id.* Harassment rises to the level of actionable, illegal discrimination only where the educational environment is "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Id.* (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 21–22 (1993)). Whether a given educational environment is hostile is determined by considering the totality of the circumstances, particularly "the frequency of the discriminatory conduct, its severity, whether the alleged conduct is 'physically threatening or humiliating rather than a mere offensive utterance,' and whether it interferes with the plaintiff's performance." *Id.* (quoting *Brown*, 68 F.3d at 540).

Breyer simply alleges, in conclusory fashion, that "[Pacific's] derogatory and patronizing statements and questions; unequal treatment; consistent unwanted attempts to force unrequested accommodations on plaintiff; persistent questioning of plaintiff's abilities based on speculations and disability stereotypes; suggestions that she should pursue other careers; refusal to support her in pursuing internships; and consistent microaggressions" created a hostile learning environment that was pervasive and severe. (Pl.'s Opp'n, at 32.) Breyer asserts this conduct constituted harassment,

and ultimately caused her to fail two midterms and to withdraw from the PsyD program. (*Id.*) She does not explain in any detail, however, the specific evidence in the record on which she relies, the specific conduct at issue, or how such conduct constitutes harassment for the purpose of establishing her claim. Moreover, she points to no evidence that suggests "discriminatory intimidation, ridicule, and insult" pervaded her experience at Pacific. Accordingly, no issues of material fact exist with respect to Count 9.

### G. Count 10: Retaliation

Retaliation is prohibited under the Acts. *See* 42 U.S.C. § 12203(a) (deeming it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter"); 34 C.F.R. § 104.61 (incorporating the anti-retaliation provision of Title VI of the Civil Rights Act of 1964); 34 C.F.R. § 100.7(e) (recipient of federal funds prohibited from "intimidat[ing], threaten[ing], coerc[ing], or discriminat[ing] against any individual for the purpose of interfering with any right or privilege . . . because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part"). Retaliation claims arising under the ADA are evaluated using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (2015). Under that framework, a plaintiff must first establish a prima facie claim of retaliation by demonstrating that (1) he or she was engaged in protected activity; (2) he or she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Id.* (quoting *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th Cir. 2012); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason

for its conduct. *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 849 (9th Cir. 2004). If such a reason is articulated, the burden shifts back to the plaintiff to demonstrate the proffered reason is pretext for a discriminatory motive. *Id.* Because the ADA and the Rehabilitation Act are interpreted in the same manner, retaliation claims arising under the Rehabilitation Act are analyzed under the same rubric. *See Douglas v. Riverside Cty. Office of Educ.*, 285 F.3d 1226, 1229 n.3 (9th Cir. 2002) (case law interpreting the Acts are "interchangeable"); *see also Lee v. Natomas Unified Sch. Dist.*, 93 F. Supp. 3d 1160, 1167 (E.D. Cal 2015) (noting the burden-shifting analysis "applies equally to retaliation claims . . . herein brought under the ADA or Section 504").

Breyer alleges Pacific retaliated against her after she complained to SPP faculty that Pacific had unlawfully discriminated against her. (Pl.'s Opp'n, at 43–44.) Instead of addressing her complaints, Breyer contends Pacific "doubled down on its discriminatory conduct," utilizing several meetings Breyer requested to discuss her concerns as opportunities "to question [her] abilities[.]" (*Id.* at 44.) Pacific does not contest Breyer's assertion that she engaged in protected activity when she complained to Pacific's faculty about discrimination. The parties disagree, however, as to whether the challenged conduct constitutes an "adverse action," and whether a causal connection exists between Breyer's complaints and the conduct alleged. Pacific thus argues Breyer cannot establish a prima facie case of retaliation, but insists that even if she could, she offers no evidence to rebut Pacific's legitimate, nondiscriminatory reasons for engaging in the conversations at issue. (Def.'s Reply, at 22–23.)

The Ninth Circuit has taken a broad view of what may constitute an adverse action. *See, e.g.*, *Ray*, 217 F.3d at 1240 (noting "a wide array of disadvantageous changes in the workplace" constitute adverse actions, including a lateral transfer, undeserved performance ratings, exclusion from

meetings and seminars, a more burdensome work schedule, and denial of secretarial support). However, a defendant's conduct does not necessarily amount to an adverse action simply because it affects an individual who engaged in protected activity. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). Rather, an adverse action is one that is "reasonably likely to deter [individuals] from engaging in protected activity." *Pardi*, 389 F.3d at 850; *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (concluding an adverse action is cognizable only if it is "harmful to the point that [it] could well dissuade a reasonable [individual] from making or supporting a charge of discrimination"). Therefore, to amount to an adverse action under the Acts, the challenged action must be "nontrivial." *Brooks*, 229 F.3d at 928. (citing *Ray*, 217 F.3d at 1243); *see also Strother v. California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir. 1996) (acknowledging "mere ostracisim in the workplace" does not amount to an adverse action); *see also, e.g.*, *Walters v. Walden University, LLC*, No. 15–5651 RJB, 2015 WL 6550754, at *10 (W.D. Wash. Oct. 28, 2015) (doctoral student not subjected to an adverse action when various professors criticized her work product, refused to accept certain assignments, and cautioned her to maintain an air of professionalism in her communications, because such actions were trivial).

Here, Breyer insists she was subjected to an adverse action when, during meetings she requested to complain of her discriminatory treatment, Pacific turned the conversation to "whether the program was the right 'fit' for [her], whether she could complete minimalistic physical portions of the program, whether she would be able to obtain internships several years down the road, and whether she should explore other career paths." (Pl.'s Opp'n, at 44.) Breyer alleges these meetings "ultimately gave [Pacific] the prime opportunities to continue to make her disability a roadblock to success and to justify its original behavior with further criticism, reservations, uncertainties, and

speculations." (*Id.*) Breyer argues that such conduct "is more likely than not sufficient to deter an ordinary person from exercising her rights." (*Id.*)

The record demonstrates, however, that Breyer attended a total of six meetings with SPP faculty after she began attending Pacific, of which she requested only three. Breyer requested the first meeting, which took place on September 14, 2015 with Drs. Elder, Tasker, and Brems, to lodge complaints about the March 12 phone call to discuss the essential functions during the admissions process. (2017 Breyer Dep. 111:19–112:3, 112:22–113:10; Elder Dep. 175:1–13, 175:22–176:13; Breyer Decl. ¶ 7.) Breyer discussed her concerns regarding the phone call at length, and later acknowledged that all involved "seemed to be open and . . . mindful about what [she] was saying" during that meeting. (2017 Breyer Dep. 119:4–8.) Breyer requested the second meeting with Dr. Clark for the purpose of discussing research ideas for a class assignment. (2018 Breyer Dep. 198:5–24.) During that meeting, Drs. Clark and Tasker reviewed Breyer's list of concerns point-by-point, and offered to intervene on Breyer's behalf to address the situation with Dr. Tram. (*Id.* 170:3–12, 210:20–211:3.) Breyer requested the third meeting specifically to "have an open and honest discussion about [her] abilities." (Richman Decl., Ex. 1, at 98–99.) On October 19, 2015, Breyer met with Drs. Clark and Arnaut to discuss the remaining program requirements to determine whether "completing [the PsyD] program [was] realistic for her." (Stephenson Decl., Ex. K, at 91.) Drs. Clark and Arnaut reviewed the remaining program requirements — including clinical assessment testing, practicums, and the internship requirement — explained how the PsyD program fit with Breyer's stated career goals, and created an action plan to determine accommodations for the upcoming Cognitive Assessment course. (Stephenson Decl., Ex. K, at 91; 2018 Breyer Dep. 228:14–229:4, 231:16–232:18; 2017 Clark Dep. 47:7–48:3.)

Thus, despite Breyer's allegations to the contrary, the record reflects that SPP faculty were receptive and responsive to Breyer's complaints during every meeting she requested, and did not simply ignore her concerns in favor of questioning her abilities. Though she takes issue with discussions about the PsyD program requirements and how she might further her career goals, Breyer herself explicitly sought to discuss those topics in the October 19, 2015 meeting with Drs. Clark and Arnaut.

Breyer also appears to support her allegations by citing Dr. Li's conduct during a meeting that occurred on October 12, 2015, but the record shows Breyer did not request that meeting, much less request it for the purpose of lodging complaints of discrimination. (Li Dep. 80:10–20.) Even if she had, however, Breyer concedes that her concerns were discussed during that meeting. (2018 Breyer Dep. 216:7–12.) Moreover, in direct response to Breyer's complaint that the PsyD program should "take note of how many [ADA] laws [it] has broken since March," Dr. Brems urged Breyer to file a written complaint with the Dean of Students, Dean Perkins. (July Richman Decl., Ex. 1, at 81.) Dr. Brems explained that a written complaint would trigger an investigation of the discriminatory conduct alleged, but Breyer did not file a complaint or otherwise contact Dean Perkins. Thus, even viewing the facts in the light most favorable to Breyer, the challenged actions are trivial at most, especially in light of the Breyer's decision to forego writing a complaint to the Dean of Students to trigger a formal investigation of her charges. Breyer therefore was not subject to an adverse action, and consequently, she cannot establish a prima facie case of retaliation under the Acts.

But, even assuming for the sake of argument that a *prima facie* case of retaliation could be established here, Pacific explains that it typically engages in the types of conversations complained of when advising students in the PsyD program, particularly when a student demonstrates a lack of

knowledge or a fundamental misunderstanding concerning specific aspects of the program. (*See e.g.*, Elder Dep. 125:24–126:19 (confirming that Pacific has conversations with every student clarifying its lack of control over the internship process); Brems Dep. 56:9–24 (noting Breyer's demonstrated misunderstanding of how students are matched with an internship site warranted an explanation of how the placement process works); Arnaut Dep. 115:13–118:22 (explaining that several things, including the internship requirement, the role of a forensic psychologist, and the options available to Breyer in the adult psychology track, were discussed during the October 12, 2015 meeting to clarify Breyer's misconceptions about those subjects); Li Dep. 81:11–20 (explaining that whether the PsyD program is the right "fit" for a given individual is "a common question to talk to students about").) Breyer has provided no evidence to suggest that Pacific's proffered reason for engaging in the challenged conduct is pretext to mask a discriminatory motive.

For the reasons explained above, Pacific did not retaliate against Breyer in response to her complaints that she was subjected to discriminatory treatment. Thus, no issues of material fact exist with respect to Count 10.

### H.     *Summary*

Pacific did not exclude or otherwise deny Breyer the benefit of the PsyD program, and no issue of material fact exists with respect to the ten counts of discrimination she alleges here.[16] Though Breyer finds many aspects of Pacific's conduct objectionable, the challenged conduct does not amount to discrimination under the ADA or Section 504. Accordingly, summary judgment as to Breyer's first and second claims for relief is GRANTED in favor of Pacific.

---

[16] Consequently, Breyer also cannot establish that Pacific acted with deliberate indifference to entitle her to compensatory damages under Section 504.

II.    Breach of Contract

Breyer's third claim for relief is for breach of contract. Specifically, Breyer alleges Pacific promised her "that it would adhere to its nondiscrimination policy," and manifested an intent to be bound by that promise by including the policy in a variety of publications provided to her, such as "its Academic Catalog, SPP Student Handbook, Faculty and Governance Handbook, Learning Support Services information and publications, Business Office Student Contract, Clinical Training Contract, [and] on its website[.]" (SAC ¶¶ 74, 75.) Breyer alleges Pacific breached the contract by discriminating against her in violation of "its own policies of non-discrimination." (*Id.* ¶ 77.)

Pacific moves for summary judgment, arguing no contract existed between the parties because Pacific explicitly disclaimed its intention to be bound by any of its regulations, policies, or procedures. (Motion, at 29–30.). Pacific further argues that, even if a valid contract existed, there was no breach because it did not provide Breyer an unequal opportunity to participate in the PsyD program or otherwise discriminate against her in violation of its nondiscrimination policy. (*Id.* at 30–31.) Breyer refutes Pacific's arguments, and contends the disclaimer at issue should not be given effect. (Pl.'s Opp'n, at 46–48.)

"The existence of an enforceable contract is an essential element to a claim for breach of contract." *Gibson v. Walden Univ., LLC*, 66 F. Supp. 3d 1322, 1324 (D. Or. 2014) (citing *Fort Vancouver Broadcasting Corp. V. Fouce Amusement Enters.*, 933 F.2d 1013 (9th Cir. 1991)). A contractual relationship is defined by a promise given in exchange for consideration. *Corbitt v. Salem Gas Light Co.*, 6 Or. 405, 406 (Or. 1877). Under Oregon law, "a student and a private university may have a contractual relationship based on the terms contained in publications that the university provides to the student." *Dauven v. George Fox Univ.*, No. CV. 09–305–PK, 2010 WL

6089077, at *16 (D. Or. Dec. 3, 2010) (citing *Tate v. N. Pacific Coll.*, 70 Or. 160, 165, 140 P. 743, 745 (1914)); *see also Bird v. Lewis & Clark Coll.*, 104 F. Supp. 2d 1271, 1276 (D. Or. 2000) (noting that "[t]he basic legal relationship between a student and a private university or College is contractual in nature," and that "[t]he catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant became a part of the contract"). Whether such materials are considered part of a contract between an academic institution and a student is dependent on the specific facts of the case. *Vejo v. Portland Pub. Schs.*, 204 F. Supp. 3d 1149, 1175 (D. Or. 2016), *rev'd in part on different grounds*, 737 Fed. App'x 309 (9th Cir. 2018) (citing *Gibson*, 66 F. Supp. 3d at 1324–25). "The relevant inquiry is whether a party's 'communications and overt acts' suggest it 'manifested assent' to be bound." *Id.* (quoting *Kabil Devs. Corp. v. Mignot*, 279 Or. 151, 566 P.2d 505, 508–09 (1977)).

Courts, however, have declined to find a valid contract exists where a student handbook or other publication expressly disclaims the formation of a contract or an intent to be bound. *See Gibson*, 66 F. Supp. 3d at 1325 (finding no contract existed where student handbook included a disclaimer that "[n]either the provisions of this document, nor the acceptance of students through registration and enrollment in the university, constitutes a contract or an offer of a contract"); *Carr v. Bd. of Regents of Univ. Sys. of Ga.*, 249 Fed. App'x 146, 151 (11th Cir. 2007) (finding no contract existed where academic catalog contained a statement that it was for "'informational purposes only and should not be construed as the basis of a contract between the student and [the Board]'"); *but see Vejo*, 204 F. Supp. 3d at 1177 (finding disclaimer that reserved college's right to change fees, admission and graduation requirements, and regulations affecting the student body did not absolve contractual duty to uphold nondiscrimination laws because a reasonable juror could conclude the

college did not retain the right "to rescind its nondiscrimination promise and begin making discriminatory decisions based on a student's race, national origin, or religion").

Here, Breyer alleges Pacific made a promise to abide by its nondiscrimination policy, a promise she accepted by matriculating in the SPP and providing consideration in the form of tuition for her attendance. (SAC ¶¶ 74–77.) Breyer claims Pacific communicated this promise in a number of publications provided to her, including the 2015-2016 Academic Catalog. (SAC ¶ 75.) But as Pacific points out, the Academic Catalog contained the following disclaimer:

> Pacific University has made reasonable efforts to ensure that the information contained in the catalog is accurate at the time of publication, but reserves the right to change the catalog or any University requirements, regulations, policies or procedures. This includes, but is not limited to, the right to discontinue courses, change requirements for admission and graduation, or adjust fees . . . The information in this catalog, as well as any other regulations, policies, or procedures of the University, is for informational purposes only and does not constitute an agreement or contract between Pacific University and students, staff, or faculty.

(Clark Decl., Ex. 2 (emphasis added).) Pacific argues that, by its terms, the disclaimer included in the Academic Catalogue expressly communicated its intention that any statements or information included in the Academic Catalog, or in "any other regulations, policies, or procedures of the University," did not constitute the terms of any contract or agreement.

Here, Pacific included a notice that expressly disclaimed any intention to be bound and explicitly denied that the statements and information contained in the Academic Catalog, or its regulations, policies, and procedures, supported the formation of a contract between the university and its students. Unlike the disclaimer in *Vejo* which simply reserved the college's right to change its fees, requirements, and decisions affecting the student body but did not reserve its right to rescind its promise to abide by nondiscrimination laws, Pacific's disclaimer specifically communicates its

intention that it will not be bound.

Breyer argues, however, that the disclaimer should not be given effect because it was not conspicuous as required by Oregon law. (Pl.'s Opp'n, at 47–48.) Specifically, she contends Pacific "buried" the disclaimer language in one paragraph in a document that is 530 pages long, without offsetting type or other attention-grabbing devices, likely because Pacific "intended to be bound" by the nondiscrimination policy. (*Id.* at 48.) Under Oregon law, a disclaimer is conspicuous if it is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." OR. REV. STAT. § 71.2010(2)(j). Whether a term is conspicuous "is a decision for the court." *Id.*

Conspicuous terms include those with "[a] heading . . . in contrasting type, font or color to the surrounding text of the same or lesser size." OR. REV. STAT. § 71.2010(2)(j)(A). Here, the disclaiming language at issue was set apart in its own paragraph under a bolded heading of larger type marked "Disclaimers." (Clark Decl., Ex. 2.) Contrary to Breyer's assertion that the disclaimer was "buried" in the 530-page Academic Catalog, the disclaimer was on the second page, immediately above the nondiscrimination policy purportedly constituting the terms of the contract to be enforced. A reasonable person seeking to enforce Pacific's promise to adhere to the nondiscrimination policy would have noticed the paragraph immediately above it marked "Disclaimers." The court thus concludes the disclaimer in the Academic Catalog was conspicuous, and therefore is enforceable. Accordingly, no contract existed between the parties in this case.

But even if an enforceable contract existed, as explained *supra*, Breyer has not shown that Pacific discriminated against her or provided her an unequal opportunity to participate in the SPP. No issue of material fact exists with respect to Breyer's breach of contract claim, and Pacific's

request for summary judgment is GRANTED.

III.     Promissory Estoppel

Breyer's fourth claim for relief alleges that even if no valid contract existed, she reasonably relied on Pacific Pacific's promise to adhere to its nondiscrimination policy, to her detriment. (SAC ¶¶ 81–84.) Pacific moves for summary judgment, arguing Pacific did not discriminate against Breyer, and even if it did, she cannot demonstrate that she relied on the nondiscrimination policy or any other promise in deciding to attend Pacific. (Motion, at 32–33.) Breyer responds that questions of material fact exist with respect to reliance, citing her review of Pacific's website, the nondiscrimination policy, "other satements regarding diversity, and promises that [Pacific] would not discriminate against [her,]" which were relied on "in making her decision to accept the offer of admission" to the SPP. (Pl.'s Opp'n, at 50.)

> Oregon has adopted the *Restatement*'s formulation of promissory estoppel:
>
> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach be limited as justice requires.

*Cocchira v. Lithia Motors, Inc.*, 353 Or. 282, 292, 297 P.3d 1277, 1283 (2013) (en banc) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981)). Thus, a plaintiff seeking to invoke promissory estoppel must demonstrate the existence of "(1) a promise; (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind that occurred; (3) actual reliance on the promise; and (4) a substantial change in position by the party seeking to enforce the promise." *Hill v. Mayers*, 104 Or. App. 629, 631, 802 P.2d 694, 695 n.2 (1990) (citing *Bixler v. First National Bank*, 49 Or. App. 195, 199, 619 P.2d 895 (1980)).

The record demonstrates that before applying to Pacific, Breyer examined the PsyD portion of Pacific's website, and reviewed information about its faculty, coursework, diversity and inclusion within the PsyD program, and licensing requirements. (2017 Breyer Dep. 78:9–80:11.) Breyer admitted in her deposition testimony that she decided to apply to Pacific because it had a forensic psychology program and because she had friends who lived in Oregon. (*Id.* 77:22–25.) After Pacific extended her an offer of admission, Breyer testified that she once again reviewed Pacific's website and spoke to several friends and colleagues "regarding [her] feelings surrounding the acceptance, and [that] this was truly a once-in-a-lifetime opportunity[.]" (2018 Breyer Dep. 105:19–107:24.) Breyer's testimony also revealed that she could not recall any promises made to her before deciding to accept admission to Pacific, remembering only that the word "diversity" was used frequently during Interview Day. (*Id.* 162:23–165:23.) Thus, as Pacific correctly points out, there is no evidence in the record to suggest Breyer relied on Pacific's nondiscrimination policy or any other alleged promise in deciding to apply to or attend Pacific. Further, as established above, Pacific did not discriminate or otherwise fail to provide Breyer with an equal opportunity to participate in the PsyD program. Accordingly, summary judgment as to Breyer's fourth claim for relief is GRANTED in favor of Pacific.

### Conclusion

For the foregoing reasons, Pacific's Motion for Summary Judgment (ECF No. 63) is GRANTED in its entirety.

DATED this _10th_ day of March, 2020.

JOHN V. ACOSTA
United States Magistrate Judge